RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0369P (6th Cir.)
File Name: 03a0369p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

_____

JAMES MCDONALD,
          _Plaintiff-Appellee,_

          _v._

WESTERN-SOUTHERN LIFE
INSURANCE COMPANY;
WESTERN-SOUTHERN LIFE
DISABILITY PLAN; SECURITY
PLAN COMMITTEE OF THE
WESTERN-SOUTHERN LIFE
DISABILITY PLAN,
          _Defendants-Appellants._

No. 02-3053

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 98-00414—John D. Holschuh, District Judge.

Argued: September 9, 2003

Decided and Filed: October 20, 2003

Before: MOORE and GILMAN, Circuit Judges; MILLS,
District Judge.*

_____

### COUNSEL

**ARGUED:** Aaron P. Rosenfeld, VORYS, SATER,
SEYMOUR & PEASE, Columbus, Ohio, for Appellants.
Tony C. Merry, PALMER VOLKEMA THOMAS,
Columbus, Ohio, for Appellee. **ON BRIEF:** Aaron P.
Rosenfeld, David A. Campbell, VORYS, SATER,
SEYMOUR & PEASE, Columbus, Ohio, for Appellants.
Tony C. Merry, PALMER VOLKEMA THOMAS,
Columbus, Ohio, for Appellee.

_____

### OPINION

_____

RICHARD MILLS, District Judge.  James McDonald
worked for Western-Southern Life Insurance Company for
nearly twenty-one years before he began receiving long-term
disability ("LTD") benefits from Western-Southern Life
Insurance Company's Flexible Benefits Plan due to his severe
depression and his aggressive personality disorder.[1]

After paying LTD benefits for over seven years, Western-
Southern terminated McDonald's LTD benefits after it
concluded that he was no longer disabled from performing
any and every occupation, business, or employment for

_____

*The Honorable Richard Mills, United States District Judge for the
Central District of Illinois, sitting by designation.

[1]We will refer to Defendants-Appellants collectively as "Western-
Southern" for ease of reference.

wages, compensation, or profit as was required by the terms of the plan in order to be considered disabled and in order to receive LTD benefits.

After the Appeals Committee affirmed Western-Southern's decision to terminate McDonald's LTD benefits, McDonald filed suit in federal district court seeking the reinstatement of his LTD benefits, which he claimed were denied in violation of his rights under the Employee Retirement Income Security Act ("ERISA"). 29 U.S.C. § 1001 *et seq*. ERISA. After reviewing the administrative record, the district judge concluded that Western-Southern's decision to terminate McDonald's LTD benefits was arbitrary and capricious, and therefore, he ordered the reinstatement of McDonald's LTD benefits.

For the following reasons, we **AFFIRM** the judgment of the district court.

## I. BACKGROUND

James McDonald began working for Western-Southern on October 11, 1976. His last position with the company was as a district sales manager in charge of the Columbus, Ohio, office. As an employee of Western-Southern, McDonald was a participant in the Western and Southern Life Insurance Company Flexible Benefits Plan. The Plan provided LTD benefits for covered employees who were determined to suffer from a long-term disability or who were determined to be long-term disabled. "Long-Term Disability or Long-Term Disabled" is defined by the terms of the plan as:

*Long-Term Disability or Long-Term Disabled* shall mean until the Covered Employee has completed 5 uninterrupted Years of Employment a disablement resulting from sickness or accidental bodily injury of such a nature that the disabled Covered Employee is receiving disability benefits under the Social Security

Act. Once a Covered Employee is receiving such benefits his period of Long-Term Disability shall be deemed to include the waiting period for such benefits. After the covered Employee has completed 5 uninterrupted Years of Employment, Long-Term Disabled shall mean the complete and continuous incapacity of the Covered Employee to engage in any and every occupation, business or employment for wages, compensation or profit.

Pursuant to the terms of the plan, a covered employee has a continuing obligation to furnish proof of his long-term disability, to be examined in order to verify his long-term disability, and to provide any release required by the plan.

In the fall of 1988, McDonald began to experience severe depression. On October 26, 1988, Western-Southern awarded McDonald short-term disability benefits due to his depression. On August 23, 1989, the Social Security Administration determined that McDonald was totally and permanently disabled. On January 12, 1990, Western-Southern notified McDonald that it had approved his application for LTD benefits, to be effective January 26, 1990, based upon his severe depression and his aggressive personality disorder.

On October 30, 1996, pursuant to a periodic evaluation of his continued eligibility for LTD benefits, Western-Southern asked McDonald to provide information to it relating to his disability and to sign an authorization for the release of his medical records.[2] Upon receipt of this material, Western-

---

[2] Throughout his disability, McDonald has been under the care of Dr. Hubert T. Goodman, a psychiatrist, and Dr. Kent G. Hamdorf, Ph.D., a psychologist. In addition, McDonald has appeared for an independent medical examination, pursuant to Western-Southern's requests, on July 10, 1989, with Dr. Michael Murphy, a psychiatrist, who gave McDonald a Minnesota Multiphasic Personality Inventory ("MMPI"), and

Southern's medical consultants believed that some of McDonald's activities, which were noted in his medical records, were inconsistent with a diagnosis of major depression.[3]    Accordingly, Western-Southern asked McDonald to submit to an independent medical examination in order to determine whether he remained eligible to receive LTD benefits.

On May 2, 1997, Dr. Richard M. Clary, a psychiatrist, examined McDonald.[4] Dr. Clary's examination consisted of a standard psychiatric evaluation, the MMPI-2 psychological test, and a clinical interview of McDonald. Thereafter, Dr. Clary submitted a report to Western-Southern which contained his evaluation of McDonald's condition and the results of McDonald's MMPI-2.

Specifically, Dr. Clary's report indicated that the results of McDonald's MMPI-2: (1) were consistent with symptoms of depression and showed an over-sensitivity to criticism; (2) displayed an underlying hostility as well as evidence of anger and resentment; and (3) indicated paranoid tendencies but did not show any paranoid delusions or psychotic thinking.    Dr. Clary diagnosed McDonald as having dysthymic disorder, a dependent personality, possible paranoid personality, macular degeneration of the left eye, decreased vision in his right eye, and high frequency hearing

_____

on July 25, 1994, with Dr. Jerold Altman, a psychiatrist.

[3]Specifically, Western-Southern noted that McDonald had been playing bridge for points, golfing, boating, and going on cruises.

[4]Western-Southern hired International Claims Specialist, a third party administrator, to select an independent medical examiner for McDonald. International Claims Specialist selected Dr. Clary without any input from Western-Southern.

loss.    Based upon his examination and interview of McDonald, Dr. Clary rendered the following conclusion:

Mr. McDonald would be able to relate satisfactorily with supervisors and co-workers.  He would be able to understand and follow instructions in a competitive setting.  He would be able to maintain attention and attendance for a reasonable period of time and would perform routine repetitive tasks without undue supervision.  He would be able to exercise acceptable judgment concerning work functions and would have some difficulty understanding the stress and pressure associated with day to day work activities. He might be able to return to work in a very low stress environment on a limited trial basis.

On May 19, 1997, Western-Southern sent McDonald a letter informing him that his LTD benefits would be terminated effective June 30, 1997.  In this letter, Western-Southern advised McDonald that, based upon Dr. Goodman's medical records and Dr. Clary's conclusions, it was terminating his LTD benefits because it now appeared that he could engage in an occupation for wages, and thus, he no longer met the definition of "Long-Term Disability or Long-Term Disabled" as defined by the terms of the plan.[5]

_____

[5]Specifically, Western-Southern wrote:

To be considered totally disabled, you must be unable to perform *any* gainful employment.  This requirement is set forth in the enclosed copy of Section 2.27 of the official plan document.

In reviewing your file, particular attention was paid to the most recent medical reports covering your condition.  This included, a copy of Dr. Goodman's medical records and the results of the medical examination completed at our request by Dr. Clary on May 2, 1997.  Based upon Dr. Goodman's medical records and the findings of Dr. Clary, it appears that you are not disabled from performing *any* occupation.  It is our decision that you did

Thereafter, Western-Southern offered McDonald a position, but he refused it.[6]

On June 4, 1997, McDonald, through counsel, filed an administrative appeal of Western-Southern's decision to terminate his LTD benefits. As part of his appeal, McDonald presented new evidence which included affidavits from Dr. Goodman, Dr. Hamdorf, and Mr. Eichenbaum, McDonald's bridge coach. Therein, both Dr. Goodman and Dr. Hamdorf opined that McDonald is totally disabled from engaging in any work for profit. In his affidavit, Mr. Eichenbaum testified that McDonald is a poor bridge player and that, based upon his observations of McDonald's bridge playing skills, he believes that McDonald is totally disabled from working.[7]

Upon receipt and review of the evidence which McDonald submitted as part of his administrative appeal, Western-Southern telephonically contacted Dr. Clary in order to discuss the issues raised by McDonald's new evidence and in order to have Dr. Clary clarify his previous findings and conclusions. Participating in this telephone call with Dr. Clary were Don Wuebbling (who was Western-Southern's

---

not qualify at this time for long-term disability benefits because it appears you could engage in an occupation for wages.

(emphasis in original).

[6]McDonald disputes Western-Southern's assertion that it made him an offer of employment after it terminated his LTD benefits; rather, McDonald claims that Western-Southern simply made a gratuitous offer to interview him knowing that there were no positions available to which he could have returned given his limitations.

[7]McDonald offered Mr. Eichenbaum's affidavit because Dr. Clary's findings were based, in part, on the fact that McDonald regularly played bridge for points, and Dr. Clary opined that this activity was inconsistent with McDonald's disability claim.

chief legal counsel and a member of the Appeals Committee), Dean Vonderheide (who was Western-Southern's director of benefits), and Megan Ratchford (who was Western-Southern's nurse coordinator). This telephone conversation was audio taped.[8] At the end of this telephone conversation, Wuebbling asked Dr. Clary to submit a second letter discussing the issues raised during their telephone conversation.

On December 17, 1997, Dr. Clary submitted an addendum to his initial report. In this addendum, Dr. Clary found that, contrary to Dr. Goodman's and Dr. Hamdorf's opinions and despite McDonald's poor bridge playing skills, McDonald was capable of returning to work. Specifically, Dr. Clary found:

In my opinion, Mr. McDonald is not suffering from any psychiatric or psychological impairment that is severe enough to prevent him from returning to work but he, in fact, does not want to return to work.

On January 2, 1998, Western-Southern informed McDonald that his administrative appeal was denied.

On April 17, 1998, McDonald filed a Complaint (which he later amended) in federal district court against Western-Southern, alleging that it had wrongfully terminated his LTD benefits in violation of his rights under ERISA. Specifically, McDonald alleged three causes of action against Western-Southern: (1) a claim to recover benefits under ERISA, 29 U.S.C. § 1132(a)(1)(B); (2) a claim for breach of fiduciary duty under ERISA, 29 U.S.C. § 1109 and § 1132(a)(3); and (3) a claim for intentional denial of benefits under ERISA, 29

---

[8]The audio tape of this telephone conversation was later transcribed, was disclosed to McDonald during discovery, and was provided to the district court as part of the parties' cross-motions for summary judgment.

U.S.C. § 1140 and 1132(a)(3).  At the conclusion of the discovery period established by the district court, McDonald and Western-Southern filed cross-motions for summary judgment.

On December 14, 2001, the district court entered an order granting in part and denying in part both parties' motions for summary judgment.  Specifically, the district court held that Western-Southern's decision to terminate McDonald's LTD benefits was arbitrary and capricious because Western-Southern could not offer a reasoned explanation, based upon the evidence in the administrative record, for finding that McDonald was able to engage in gainful employment and, thereby, rendering him ineligible for LTD benefits under the plan.  In reaching this conclusion, the district court noted the unanimity of the opinions of Dr. Goodman and Dr. Hamdorf regarding McDonald's disability, found that Dr. Clary's initial report was an insufficient basis upon which to terminate McDonald's LTD benefits because Dr. Clary merely stated that McDonald might be able to return to work in a very low stress environment on a limited trial basis, and held that Dr. Clary's supplemental report should be given "very little weight" because it was radically different from his initial report and because it was rendered only after an *ex parte* telephone conference with Western-Southern's representatives.   Accordingly, the district court entered judgment in McDonald's favor and against Western-Southern on his claim to recover benefits and ordered the reinstatement of McDonald's LTD benefits.

As for McDonald's two other claims, the district court found against McDonald and in Western-Southern's favor.  Specifically, the district court held that McDonald's breach of fiduciary duty claim was barred because it was redundant to his claim for denial of benefits, and the district court found that McDonald's claim for intentional denial of benefits failed because McDonald presented no evidence that Dr. Clary was biased or predisposed to concluding that he was able to work

and, therefore, not disabled.  On January 4, 2002, Western-Southern filed a timely notice of appeal from the district court's order.[9]

## II. DISCUSSION

The sole issue which the Court must decide in this appeal is whether or not the district court erred in holding that Western-Southern's decision to terminate McDonald's LTD benefits was arbitrary and capricious.  We find that the district court did not err in so holding.

### A.   *ARGUMENTS*

### 1.   *Western-Southern*

Western-Southern claims that there are two issues which this Court must address in order to resolve this appeal.  The first issue is whether Western-Southern substantially complied with ERISA's procedural requirements, and if not, whether the substantive remedy imposed by the district court was proper. Western-Southern argues that the district court's order should be reversed because the district court erroneously concluded that it had failed to comply with ERISA's procedural requirements in terminating McDonald's LTD benefits, and thus, the district court improperly granted a substantive remedy to McDonald as a result of this alleged procedural defect.  Specifically, Western-Southern asserts that the district court erred in holding that the telephone call between members of its Appeals Committee and Dr. Clary was improper and constituted a "procedural defect" because

---

[9]On February 20, 2002, the district court denied McDonald's motion for attorney's fees and nontaxable costs but granted his motion to amend the judgment to include an award for prejudgment interest.  McDonald does not challenge this order by the district court on appeal, nor has he appealed the district court's ruling against him with regard to his claim for breach of fiduciary duty or his claim for intentional denial of benefits.

neither McDonald nor his counsel were included in the telephone call. Based upon this finding of an alleged procedural defect, Western-Southern contends that the district court improperly disregarded a highly relevant portion of the administrative record, *i.e.*, Dr. Clary's supplemental report.

Western-Southern argues that it provided McDonald with a full and fair review of the record on his administrative appeal and that the procedures which occurred in this case substantially complied with the requirements of 29 U.S.C. § 1133. Western-Southern asserts that, contrary to the district court's characterization, there was nothing improper about its employees contacting Dr. Clary for a clarification of his initial report. Western-Southern contends that ERISA's claims procedures are not adversarial or "trial-like" as described by the district court; on the contrary, ERISA's claims procedures are designed to be an inexpensive, expeditious, and non-adversarial method of claims settlement. Thus, Western-Southern asserts that the district court erred in failing to fully consider Dr. Clary's supplemental report because this Court has adopted a rule of substantial compliance under § 1133. *See Kent v. United of Omaha Life Ins. Co.*, 96 F.3d 803, 808 (6th Cir. 1996)(holding "that when claim communications as a whole are sufficient to fulfill the purposes of Section 1133 the claim decision will be upheld even if a particular communication does not meet those requirements.").

Furthermore, Western-Southern argues that its ERISA fiduciary obligations and the terms of the plan itself required it to investigate McDonald's claims on appeal. Contrary to the district court's conclusions, Western-Southern contends that Dr. Clary's initial report is not in conflict with his supplemental report. In both reports, Dr. Clary concludes that McDonald is not disabled, as that term is defined by the plan, and his supplemental report merely explains whatever ambiguity exists in his initial report. Thus, Western-Southern

claims that the district court had no basis to disregard Dr. Clary's supplemental report.

Finally, Western-Southern argues that, even assuming *arguendo* that a procedural defect exists, the remedy of wholly discounting Dr. Clary's supplemental report is contrary to Sixth Circuit precedent. *See Id*. at 807 (holding that "[g]enerally, the courts have recognized in ERISA cases that procedural violations entail substantive remedies only when some useful purpose would be served.").

The second issue that Western-Southern claims must be resolved in this appeal is whether the district court erred in holding that its decision to terminate McDonald's LTD benefits was arbitrary and capricious. Given the plan's definition of long-term disability or long-term disabled as the incapacity to engage in any and every occupation for wages, given Dr. Clary's opinion that McDonald is not suffering from a condition which prevents his return to work, and given Dr. Goodman's medical reports which indicate that McDonald is playing bridge for points, golfing, boating, and going on vacations, Western-Southern contends that it would defy logic to affirm the district court's decision because it is possible to offer a reasoned explanation, based upon the administrative record, for the termination of McDonald's LTD benefits. Accordingly, Western-Southern asks the Court to reverse the district court's order and to remand this case with directions to the district court to enter judgment in its favor.

2. *McDonald*

McDonald concedes that the district court correctly found "arbitrary and capricious" to be the appropriate standard of review because the terms of the plan give the plan administrator the discretionary authority to determine eligibility for benefits and to construe the terms of the plan. However, McDonald argues that the district court's order

should be affirmed because the district court also correctly found that Western-Southern's decision to terminate his LTD benefits was arbitrary and capricious given the administrative record. McDonald claims that the evidence overwhelmingly establishes that he is totally disabled (as defined by the terms of the plan) and that Western-Southern had no reasonable basis for determining otherwise.

McDonald asserts that the medical evidence indicates that he has had a mental illness since 1989, that his condition has not improved over time, that his condition is not likely to improve, and that his treating physicians believe him to be disabled. In fact, McDonald notes that even Dr. Clary believed that more treatment with his psychologist would be unlikely to result in any improvement or change in his condition.

Moreover, McDonald asserts that, other than Dr. Clary's supplemental report, there is no evidence in the administrative record to indicate that there has been a change in his condition, nor has any new medical evidence been presented since Western-Southern initially determined him to be disabled which would support a conclusion that he is now no longer disabled. The Social Security Administration has concluded that he is disabled, his treating physicians and the independent medical examiners (save Dr. Clary) have found him to be disabled, and his MMPI and MMPI-2 tests support a finding of disability.

Finally, McDonald argues that the district court correctly discounted Dr. Clary's supplemental report. Contrary to Western-Southern's characterization of the facts, McDonald claims that the district court did not refuse to consider Dr. Clary's supplemental report due to any "procedural irregularity" in the manner in which it was obtained, nor did it impose any "substantive remedy" as a result of this irregularity. Rather, the district court simply found that the report should be given " very little weight" because the

supplement contradicted Dr. Clary's initial opinion and because the only event which triggered the change in Dr. Clary's opinion was a telephone call from members of Western-Southern's appeals committee. Under these circumstances, McDonald argues that the district court correctly found Western-Southern's decision to terminate his LTD benefits to be arbitrary and capricious, and thus, this Court should affirm the district court's decision.

B.    *ANALYSIS*

We have explained:

> As a general principle of ERISA law, federal courts review a plan administrator's denial of benefits *de novo*, "unless the benefit plan gives the plan administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609, 613 (6th Cir. 1998)(*citing Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S. Ct. 948, 103 L. Ed.2d 80 (1989)). When a plan administrator has discretionary authority to determine benefits, we will review a decision to deny benefits under "the highly deferential arbitrary and capricious standard of review." *Yeager v. Reliance Standard Life Ins. Co.*, 88 F.3d 376, 380 (6th Cir. 1996).

*Sanford v. Harvard Indus., Inc.*, 262 F.3d 590, 595 (6th Cir. 2001). "[T]he arbitrary and capricious standard is the least demanding form of judicial review of administrative action. When applying the arbitrary and capricious standard, the Court must decide whether the plan administrator's decision was rational in light of the plan's provisions. Stated differently, when it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious." *Williams v. International Paper Co.*, 227 F.3d 706, 712 (6th Cir. 2000)(internal citations and quotations omitted).

Generally, when a plan administrator chooses to rely upon the medical opinion of one doctor over that of another in determining whether a claimant is entitled to ERISA benefits, the plan administrator's decision cannot be said to have been arbitrary and capricious because it would be possible to offer a reasoned explanation, based upon the evidence, for the plan administrator's decision.[10] *See Abnathya v. Hoffmann-LaRoche, Inc*., 2 F.3d 40, 47 (3d Cir. 1993)(holding that a plan administrator may rely upon a single medical opinion finding that an employee is not disabled); *see also Donato v. Metropolitan Life Ins. Co.*, 19 F.3d 375, 380 (7th Cir. 1994)(upholding a plan administrator's denial of benefits where a psychiatrist found the employee to be "severely depressed," there being insufficient evidence to "support the conclusion that [the plaintiff's] depression, regardless of treatment, would constitute a total disability" and upholding plan administrator's denial of claim where independent medical consultant's opinion was contrary to plaintiff's doctor's opinion); *see also Birdsell v. United Parcel Serv. of Am.*, 94 F.3d 1130, 1133 (8th Cir. 1996)(holding that a plan administrator's decision to deny benefits was not arbitrary or capricious simply because the plan administrator adopted one of two competing views).

Under these circumstances, however, the district court did not err in refusing to defer to Western-Southern's reliance upon Dr. Clary's opinion in terminating McDonald's LTD benefits or in finding Western-Southern's decision to be arbitrary and capricious.

The medical evidence establishes that McDonald's diagnosis and condition have remain unchanged since he was first diagnosed with severe depression and aggressive personality disorder in the late 1980's and was awarded LTD benefits by Western-Southern. As noted *supra*, the results of his MMPI-2 in 1997 are substantially similar to the results of his 1989 MMPI, and even Dr. Clary admitted that more treatment with his psychologist would be unlikely to result in any improvement or change in McDonald's condition. Both Dr. Goodman and Dr. Hamdorf have unequivocally and repeatedly opined that, based upon the medical evidence and their treatment of him, McDonald is totally incapable of returning to work due to his mental condition. *See Hoover v. Provident Life and Accident Ins. Co.*, 290 F.3d 801, 809 (6th Cir. 2002)(applying a *de novo* standard of review in finding that "Provident relied on the IME performed by Dr. Roseman and the review of Hoover's medical records by Provident's in-house physicians . . . . As pointed out by the district court, although Dr. Roseman's assessment did not totally endorse the assessment of Hoover's treating physician, Dr. Vinson, he did not refute it. The evidence presented in the administrative record did not support the denial of benefits when only Provident's physicians, who had not examined Hoover, disagreed with the treating physicians. Under these circumstances, the district court's decision to reverse Provident's denial of residual benefits to Hoover was correct . . . .").

In addition, two independent medical examiners questioned McDonald's ability to return to work. In 1989, Dr. Murphy opined that McDonald may be able to return to work but only under careful supervision of his therapist. In 1994, Dr. Altman opined that McDonald could not return to his usual occupation. Dr. Altman also noted that McDonald's severe personality disorder prevented him from progressing and that,

---

[10]In *Black & Decker Disability Plan v. Nord*, ___ U.S. ___, 123 S. Ct. 1965 (2003), the United States Supreme Court held "that plan administrators are not obliged to accord special deference to the opinions of treating physicians" and "that courts have no warrant to order application of a treating physician rule to employee benefit claims made under ERISA . . . ." *Id*. at 1966, 1969.

because he has long since made any progress which he is going to make, therapy would only be supportive for him.[11]

What remains are the initial and supplemental reports of Dr. Clary. As noted *supra*, in his initial report, Dr. Clary opined:

> Mr. McDonald would be able to relate satisfactorily with supervisors and co-workers. He would be able to understand and follow instructions in a competitive setting. He would be able to maintain attention and attendance for a reasonable period of time and perform routine repetitive tasks without undue supervision. He would be able to exercise acceptable judgment concerning work functions and would have some difficulty withstanding stress and pressures associated with day to day work. He might be able to return to work in a very low stress environment on a limited trial basis.

We believe that Dr. Clary's initial report was an insufficient basis upon which to determine that McDonald could engage in an occupation for wages. *First*, Dr. Clary's opinion (which was contained within his initial report) regarding whether McDonald was disabled was ambiguous at best. The best evidence of this ambiguity lies in the fact that Western-Southern had to contact Dr. Clary in order to have him clarify his report.[12]

---

*Second*, in his initial report, Dr. Clary merely opined that McDonald might be able to return to work under certain limited circumstances. The mere possibility that a participant in an ERISA plan might be able to return to some type of gainful employment, in light of overwhelming evidence to the contrary, is an insufficient basis upon which to support a plan administrator's decision to deny that participant's claim for LTD benefits. *See Mein v. Pool Co. Disabled Int'l Employee Long Term Disability Benefit Plan*, 989 F. Supp. 1337, 1350 (D. Colo. 1998)(holding that a plan administrator's decision to deny ERISA benefits was arbitrary and capricious where it was based upon a physician's opinion that the claimant may be capable of some sedentary work); *see also Norris v. Citibank, N.A. Disability Plan*, 308 F.3d 880, 883-84 (8th Cir. 2002)(quoting *Fletcher- Merrit v. NorAm Energy Corp.*, 250 F.3d 1174, 1179 (8th Cir. 2001)(holding that "'[s]ubstantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Both the quantity and quality of evidence may be considered.'"); *but see Miller v. Metropolitan Life Ins. Co.*, 925 F.2d 979, 985 (6th Cir. 1991)(holding that "Plaintiff makes much of the fact that in the narrative portion of his report, Dr. Murthi stated that he recommended a return to work *on a trial basis*. . . . Even though Dr. Murthi recommended work only on a trial basis, we do not believe Metropolitan's action in terminating

---

[11]Apparently, Western-Southern took no action with regard to McDonald's LTD benefits after it received Dr. Murphy's and Dr. Altman's reports.

[12]During Western-Southern's telephone conference with Dr. Clary, Wuebbling said: "And we went through your evaluation of his condition (unintelligible) make a decision about the status of disability benefits, and it kind of looks, going through the – the evaluation, is though he was doing an awful lot of things that are consistent with someone who could function pretty well in a working environment. Maybe not interact with

people a whole lot, but – but do a lot of things. And we were a little uncertain in that towards the end of your letter (unintelligible) indicates that – or he indicates some hesitancy about his being able to work, or at least that's the way we're reading it and maybe that's not the way you intended it – to read. But towards the end (unintelligible) saying that he might be able to return to work in a very low-stress environment on a limited trial basis, which suggests that maybe he couldn't return to work or couldn't work and that (unintelligible) seems sort of (unintelligible) what you were saying in the earlier part of the letter, and we were wondering if we were reading it right, interpreting it right or what?"

benefits was inconsistent with the scheme as set forth in the Plan.")(emphasis in original).

Likewise, we believe that Dr. Clary's supplemental report was an insufficient basis upon which to determine that McDonald could engage in an occupation for wages. In his supplemental report, Dr. Clary was much more forceful in his conclusion that McDonald was able to engage in gainful employment. In fact, Dr. Clary went so far as to accuse McDonald of malingering in his ability to return to work:

> In my medical opinion, Mr. McDonald is not suffering from any psychiatric or psychological impairment that is severe enough to prevent him from returning to work but he, in fact, does not want to return to work.

Although the district court found that there was no evidence of bias by Dr. Clary and although there was nothing untoward about Western-Southern contacting Dr. Clary in order to have him clarify his initial report, it is noteworthy that Dr. Clary became more definite in his opinion only after he was contacted by Western-Southern. In his supplemental report, Dr. Clary did not change his diagnosis of McDonald, did not modify the results of McDonald's MMPI-2, or alter his belief that therapy would be of little use to McDonald. Moreover, he did not re-examine McDonald, nor did he receive any new medical evidence or reports upon which to base his clarified conclusion. In fact, the only new medical evidence submitted after Dr. Clary's initial report was reports from Dr. Goodman and Dr. Hamdorf in which they reiterated their opinions that McDonald was disabled and which attempted to rebut Dr. Clary's conclusions contained within Dr. Clary's initial report.

Therefore, we agree with the district court that Dr. Clary's supplemental report should be discounted. Dr. Clary's supplemental report was significantly different than his initial report without any justification for the change, other than the

telephone contact from Western-Southern. *See EEOC v. UPS*, 149 F. Supp. 2d 1115, 1139 (N.D. Cal. 2000)(finding that the defendant's principal expert witness was not credible because the changes made to his draft expert report were all made at the suggestion of defense counsel, and thus, "[i]n context, it seems clear that [the expert] lost his independence and objectivity. He simply became part of the UPS advocacy team."). Although Dr. Clary opined that McDonald could return to work, he did not say what kind of work he could perform. *See Quinn v. Blue Cross and Blue Shield Ass'n*, 161 F.3d 472, 476 (7th Cir. 1998)("At her deposition, however, Calhoon admitted that she did not know what Quinn's job duties entailed, what her exertional requirements were, any training and experience she possessed, or any transferable skills she may have obtained. Calhoon simply based her opinion on her own notion of what a payroll accounts assistant does. This, without more, is not enough. We agree that Calhoon was under no obligation to undergo a full-blown vocational evaluation of Quinn's job, but she was under a duty to make a reasonable inquiry into the types of skills Quinn possesses and whether those skills may be used at another job that can pay her the same salary range as her job with HCSC."); *see also VanderKlok v. Provident Life and Accident Ins. Co.*, 956 F.2d 610, 614-15 (6th Cir. 1992) (quoting *Torix v. Ball Corp.*, 862 F.2d 1428, 1431 (10th Cir. 1988)("the phrase 'prevented from engaging in every business or occupation' [in an ERISA plan] cannot be construed so narrowly that an individual must be utterly helpless to be considered disabled and that nominal employment, such as selling peanuts or pencils which would only yield a pittance, does not constitute a 'business or occupation.' Instead, a claimant's entitlement to payments based on a claim of 'total

disability' must be based on the claimant's ability to pursue 'gainful employment in light of all the circumstances.'").[13]

Finally, contrary to Western-Southern's argument, the highly deferential standard of review applicable in this case does not automatically mandate adherence to Western-Southern's decision. "Review under [the arbitrary and capricious] standard is extremely deferential and has been described as the least demanding form of judicial review. It is not, however, without some teeth." *Cozzie v. Metropolitan Life Ins. Co.*, 140 F.3d 1104, 1107-08 (7th Cir. 1998) (internal citation omitted). "'Deferential review is not no review,' and 'deference need not be abject.'" *Hess v. Hartford Life & Accident Ins. Co.*, 274 F.3d 456, 461 (7th Cir. 2001)(quoting *Gallo v. Amoco Corp.*, 102 F.3d 918, 922 (7th Cir. 1996)). In the instant case, the district court had an obligation under ERISA to review the administrative record in order to determine whether the plan administrator acted arbitrarily and capriciously in making ERISA benefits determinations. This obligation inherently includes some review of the quality and quantity of the medical evidence and the opinions on both sides of the issues. Otherwise, courts would be rendered to nothing more than rubber stamps for any plan administrator's decision as long as the plan was able to find a single piece of evidence–no matter how obscure or untrustworthy–to support a denial of a claim for ERISA benefits. *See Hackett v. Xerox Corp. Long-Term Disability Income Plan*, 315 F.3d 771, 774-75 (7th Cir. 2003)("Review

---

[13]Another reason why his supplemental report should be discounted is because Dr. Clary concluded that McDonald's challenge to Western-Southern's termination of his LTD benefits was indicative of his ability to return to work: "In my medical opinion, the vigorous pursuit of disability claim would argue against disability for severe depression." This "medical" conclusion, of course, is absurd and would render meaningless the statutory right to file suit in district court in order to challenge denials of ERISA benefits and denials of disability insurance benefits and supplemental security income under the Social Security Act.

under the deferential arbitrary and capricious standard is not a rubber stamp and deference need not be abject. Even under the deferential review we will not uphold a termination when there is an absence of reasoning in the record to support it. The termination decision here is just such a decision.")(internal citation omitted); *see also Swaback v. American Info. Techs. Corp.*, 103 F.3d 535, 540 (7th Cir. 1996)(holding that "[a]lthough we review the committees' actions in a deferential light, we shall not rubber stamp their decisions.").

### III. CONCLUSION

Accordingly, for the reasons set forth above, we **AFFIRM** the judgment of the district court.