**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 07a0726n.06
Filed: October 9, 2007

**No. 06-2422**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| **ARNITA FORCE**, | ) | |
| | ) | ON APPEAL FROM THE |
| *Plaintiff-Appellee*, | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE EASTERN |
| v. | ) | DISTRICT OF MICHIGAN |
| | ) | |
| **AMERITECH CORPORATION, INC.**, | ) | **O P I N I O N** |
| | ) | |
| *Defendant-Appellant*. | ) | |
| | ) | |

BEFORE:     COLE, COOK, Circuit Judges; and FROST, District Judge.[*]

**R. GUY COLE, JR., Circuit Judge.** Plaintiff-Appellee Arnita Force brought this suit against Defendant-Appellant Ameritech Corporation, Inc. ("Ameritech"), alleging wrongful termination of her long-term disability ("LTD") benefits under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(1)(B). The district court concluded that Ameritech's decision to terminate Force's LTD benefits was arbitrary and capricious. For the reasons that follow, we **AFFIRM** the judgment of the district court.

**I.**

**A. Factual Background**

---

[*] The Honorable Gregory L. Frost, United States District Judge for the Southern District of Ohio, sitting by designation.

Arnita Force was employed by Ameritech from September 1978 to July 1994. As a result of a car accident that occurred on July 4, 1994, Dr. Howard Schwartz diagnosed Force with cephalalgia (i.e., headaches or head pain), cervical strain, and right shoulder strain. X-rays conducted after the accident indicated "osteophytic spurring of C5[-]C6 with a fracture of the osteophyte inferior plate[, and d]iminished disc space at C4-C5." (JA 217.) Dr. Schwartz indicated on Disability Certificates dated August 5, 1994 and September 9, 1994 that Force was precluded from "bending, lifting, twisting, and prolonged standing," and that she was "disabled." (JA 218-24.) Due to these injuries, Force applied for and received short-term disability benefits for fifty-two weeks, from August 1994 to August 1995. Following the expiration of her short-term disability benefits, Force applied for and received LTD benefits from August 1995 through May 1998.

On June 21, 1995, Dr. Schwartz completed an "Attending Physician's Statement of Functional Capacity," which noted that Force was severely limited in her ability to walk, stand, and sit, and characterized Force as "totally disabled for [her] occupation." (JA 252-53.) In a September 11, 1996 letter, Dr. Schwartz stated that

> [Force's] primary diagnosis is chronic pain syndrome, low grade cervical and lumbar radiculopathy, and tendinitis of the right wrist. She should avoid any and all activities that would cause reaching, pushing, repetitive movements, climbing, bending, stooping, or operating any equipment or machinery that would endanger her or coworkers. She should also avoid any prolonged sitting (not more than 30 minutes), or standing (not more than 10 minutes), because of her chronic pain. It is advisable and necessary that she have bed rest several times during the course of the day.
>
> I believe that she should not do any lifting of any sort of weight, and this should be avoided completely.

(JA 239.) Dr. Schwartz also advised that "[u]nless and until [Force's] condition significantly

improves, she will remain totally disabled from any employment." (*Id.*)

On September 13, 1996, two days after Dr. Schwartz's letter, MetLife, a third-party administrator for the Ameritech Disability Service Center, informed Force that she might be eligible for Social Security disability benefits and encouraged her to apply. The letter also stated that MetLife had forwarded Force's information to Kennedy & Associates, a law firm specializing in obtaining such benefits. Subsequently, Force applied for and received Social Security disability benefits retroactive to July 1994. On June 18, 1997, Force repaid Ameritech $26,396.67, because LTD benefits are offset by any Social Security disability benefits the employee receives.

Time did not alleviate Force's health problems. Roughly three years after the car accident, on January 25, 1997, a CT scan revealed spinal stenosis at C5-C6, a mild diffuse bulge at C2-C3, narrowing of the left L4-L5 neural foramen, and "evidence of a congenital anomaly involving L5 vertebra and the upper sacrum [associated] with a rotary scoliosis." (JA 261-62.)

Dr. Schwartz referred Force to Dr. Armando Ortiz, a specialist in neurological surgery, who examined Force on March 11, 1997. Dr. Ortiz found that Force had "slight limitation of movements of the cervical spine in all directions because of discomfort" but otherwise concluded that she had "no other focal localized neurological findings." (JA 256.) Dr. Ortiz also noted that

> [t]he motor, sensory and coordination of the upper extremities is intact. Although she states that there might be a little difference in the perception of sensation to pinprick on the right, compared to the left, I find no definite pattern for this involvement. The same happened in the area of the C2 dermatome, where she may have some hypesthesia in the C2 on the right.

(JA 257.) Ultimately, Dr. Ortiz concluded that "[Force] has evidence of cervical spondylosis." (*Id.*) Dr. Ortiz questioned "whether the spondylosis [was] . . . due to the trauma [of the car accident] . .

. ," but opined, "I am inclined to believe that there was a pre-existing condition which was definitely aggravated by the accident, and is causing now the subjective complaints that the patient has." (*Id.*)

On December 22, 1997, Force underwent a Functional Capacity Evaluation (FCE) at Ameritech's request. The FCE report, dated January 12, 1998, was written by Scott McKay, a non-physician occupational therapist. The report explained that "[t]he evaluation was performed to assess the client's physical abilities and limitations related to her present level of functioning." (JA 133.) Under the heading "Physical Demand Level," the report stated that Force "demonstrated the physical ability to work at the SEDENTARY Physical Demand Level for the 6 hours of the evaluation" and explained that sedentary "is defined by the Dictionary of Occupational Titles . . . as lifting 10 [pounds] infrequently." (JA 134.) Under the heading "Digital Tenderness Mapping," the report stated that Force's "result[s] appear to correlate with true medical impairment and disability." (JA 134-35.) The report concluded that "Force exhibited minimal symptom/disability exaggeration behavior by our criteria . . . ," and it then stated that "during the evaluation Ms. Force's comments in regard to her limited abilities could be [construed] as symptoms exaggeration, as her comments were consistently underestimating her abilities." (JA 135.) Ultimately, the report concluded that "Ms. Force presents significant impairments which may adversely affect return to work," classified her "functional abilities" as consistent with a work demand of "sedentary-light," and recommended that "Force may benefit from a Work Conditioning program emphasizing strength, fitness, stabilization principles and body mechanics." (JA 135-36.)

On March 9, 1998, Kathleen Roche, a non-physician "Return-To-Work Specialist," sent

Connie Neier, an LTD specialist with Ameritech, a transferable skills analysis for Force, addressing "Force's ability to work in a Sedentary position." (JA 125.) The letter stated that "[t]he analysis is based on review of chart notes and medical records, which include her restrictions and limitations; the [claimant's] education and vocational history; and review of vocational reference materials." (*Id.*) Based on Dr. Ortiz's letter and the FCE report, Roche concluded that Force "has the physical capacity to perform sedentary work" and "would be able to perform her [previous] job duties as a Manager, Publishing Graphic Center." (JA 126.) Roche also listed ten additional jobs that Force could perform, since all were classified as sedentary work.

On March 24, 1998, Neier, in a written letter, informed Force that Ameritech was terminating her LTD benefits because she was no longer "eligible . . . under the Ameritech Long Term Disability Plan." (JA 111-12.) Force then requested an administrative appeal. Upon reassessing Force's LTD claim, the Employees' Benefit Committee at Ameritech upheld the denial of benefits on October 21, 1998.

**B. Procedural History**

Force then instituted the present lawsuit in federal district court on April 15, 2003 under Section 502 of ERISA, 29 U.S.C. § 1132(a)(1)(B). Shortly thereafter, the case was stayed upon agreement of the parties to allow Ameritech to reevaluate Force's claim. Pursuant to the parties' stipulation, Ameritech enlisted the SBC Medical Absence and Accommodations Research Team Quality Review Unit (the "Unit") to reconsider Force's appeal and conduct an independent assessment. The Unit in turn referred Force's entire disability claim file to Dr. Vernon Mark, a

board-certified specialist in neurosurgery, for independent review. Through a letter dated September 27, 2004, Dr. Mark informed the Unit that, based on his review of prognosis notes from Force's previous medical consultations, the FCE report from December 1997, and the Transferable Skills Analysis from March 1998, Force "was not disabled from her regular job on the basis of objective findings." (Supp. JA 380.) Although Dr. Mark found "some limitation on [Force's] range of neck movement, a slightly decreased biceps jerk and some degree of central stenosis at C5/C6," in his estimation, these conditions did not "impair. . . her ability to perform her own occupation or any sedentary job duty." (*Id*.) Overall, Dr. Mark concluded that Force had an "essentially normal neurological evaluation." (Supp. JA 381.)

On the basis of Dr. Mark's evaluation, the Unit determined that Force's medical condition was not so severe as to prevent her from performing her primarily sedentary duties at Ameritech and recommended that the denial of Force's LTD benefits be affirmed. Accordingly, Ameritech sent a final letter to Force, dated November 8, 2004, upholding its termination decision.

Following this final denial later, Force re-instituted her case in federal district court. Force again alleged that Ameritech wrongfully terminated her LTD benefits under Section 502 of ERISA, 29 U.S.C. § 1132(a)(1)(B). The case was assigned to a magistrate judge who issued a Report and Recommendation on September 5, 2006. In his report, the magistrate judge recommended that Force's motion should be granted on the basis of (1) a conflict of interest between Ameritech's role in both determining benefits eligibility and paying those benefits; (2) Ameritech's disregard of the Social Security Administration's determination that Force was disabled; and (3) existing medical evidence. On September 19, 2006, the district court adopted the magistrate judge's recommendation

and thereby determined that Ameritech had wrongfully denied Force's claim for LTD benefits. Ameritech timely appealed to this Court.

## II. STANDARD OF REVIEW

When an ERISA plan administrator "has no discretion to determine benefits eligibility," this Court engages in a *de novo* review of the benefits eligibility decision. *Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 291 (6th Cir. 2005). If, however, the plan administrator or fiduciary has discretionary authority to determine benefits eligibility or to construe the terms of the plan, then this Court employs "the highly deferential arbitrary and capricious standard of review." *McDonald v. W.-S. Life Ins. Co.*, 347 F.3d 161, 168 (6th Cir. 2003) (quoting *Yeager v. Reliance Standard Life Ins. Co.*, 88 F.3d 376, 380 (6th Cir. 1996)); *see also Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). Under the arbitrary-and-capricious standard of review, the administrator's decision is upheld if it is "rational in light of the plan's provisions" and "when it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome . . . ." *McDonald*, 347 F.3d at 169 (quoting *Williams v. Int'l Paper Co.*, 227 F.3d 706, 712 (6th Cir. 2000) (internal quotation marks omitted)).

It is well established that the arbitrary-and-capricious standard "is the least demanding form of judicial review of administrative action." *Williams*, 227 F.3d at 712. Nevertheless, this Court explained in *McDonald* that "[d]eferential review is not no review, and deference need not be abject." 347 F.3d at 172 (quoting *Hess v. Hartford Life & Accident Ins. Co.*, 274 F.3d 456, 461 (7th Cir. 2001), and *Gallo v. Amoco Corp.*, 102 F.3d 918, 922 (7th Cir. 1996) (internal quotation marks

omitted)).

Here, the district court correctly reviewed Ameritech's denial of LTD benefits under an arbitrary-and-capricious standard of review because Ameritech's Long-Term Disability Plan grants Ameritech, through the Employee Benefits Committee, the right to grant or deny claims for benefits under the Plan. Thus, Ameritech, although not the direct plan administrator, is nonetheless a fiduciary[**] with discretionary authority to determine benefits eligibility.

### III. DISCUSSION

1.    Conflict of Interest

The district court properly concluded that Ameritech's denial of LTD benefits to Force was arbitrary and capricious, based in part on an apparent conflict of interest. In *Glenn v. Metropolitan Life Insurance Co.*, 461 F.3d 660, 666 (6th Cir. 2006), this Court explained that where the employer "is authorized both to decide whether an employee is eligible for benefits and to pay those benefits[,] [t]his dual function creates an apparent conflict of interest." The Supreme Court elaborated in *Firestone Tire & Rubber Co.*, 489 U.S. at 115, that "if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a 'facto[r] in determining whether there is an abuse of discretion.' " *Id.* (quoting Restatement

---

[**]Under 29 U.S.C. § 1002, Ameritech is a fiduciary because it exercises "discretionary authority or discretionary control respecting management of [the ERISA LTD] plan or exercises any authority or control respecting management or disposition of [the Plan's] assets. Under the Plan, the Employee Benefits Committee, selected by Ameritech, "determines conclusively for all parties all questions arising in the administration of the Plan" and further has "the right to grant and deny initial claims for benefits under the Plan . . . ." (JA 343.)

(Second) of Trusts § 187 cmt. d (1959)).

The district court here did just that. The magistrate judge considered Ameritech's conflict of interest as a factor in determining whether Ameritech's decision to deny Force LTD benefits was arbitrary and capricious. Specifically, the magistrate judge noted that "Ameritech is the plan funder [sic], and has, through its Benefits Committee, the authority to grant or deny LTD benefits. In other words, Ameritech is authorized to decide eligibility for benefits and to pay those benefits creating an apparent conflict of interest." (JA 19.)

Because Ameritech has the authority to determine eligibility for benefits and to pay out those benefits, the district court did not err in concluding that Ameritech was operating under a potential conflict of interest—a factor that is relevant to whether Ameritech's denial of LTD benefits was arbitrary and capricious. *Calvert*, 409 F.3d at 292 (explaining that the defendant's possible conflict of interest is a relevant factor in determining whether its benefits eligibility decision was arbitrary and capricious). Although MetLife, an independent third party, plays a role in administering LTD benefits, Ameritech's LTD Plan neither mentions MetLife nor makes clear MetLife's specific functions. In fact, the Plan itself states that Michigan Bell Telephone Company ("Michigan Bell") is the plan administrator. Michigan Bell is a wholly-owned subsidiary of Ameritech, and therefore is not an independent third-party administrator. Further, the "Plan Administration" section states that "[t]he Employees' Benefit Committee which is appointed by the Company, has the right to grant and deny initial claims for benefits under the Plan and to review on appeal claims it has denied." (JA 343.) Thus, under the Plan, a committee selected by Ameritech has the power to determine benefits eligibility and to interpret the terms of the Plan.

2.	Medical Evidence

The district court also properly concluded that, based on the medical evidence, Ameritech's termination of Force's LTD benefits was arbitrary and capricious. Ameritech argues that the district court erred by relying exclusively on Ameritech's denial letters of March 1998 and October 1998 in reaching this conclusion, because the November 2004 letter superseded these previous letters. To the extent that the district court based its findings on the two 1998 letters, however, we find this error harmless, because the 2004 denial letter suffers from similar deficiencies to those contained in the prior letters.

Specifically, the records Ameritech relied on to deny Force LTD benefits have several inconsistencies. Along with the January 1998 and March 1998 denial letters, the 2004 denial letter, which incorporated the findings of Dr. Mark, focused primarily on the FCE report from January 1998. In his report to Ameritech, Dr. Mark noted that "[t]he summary of the [FCE] reported that Ms. Force's functional abilities were consistent with sedentary work demands." (Supp. JA 381.) The FCE report, however, was prepared by a non-physician and was based on a single evaluation of Force.

Furthermore, the FCE report is internally inconsistent:

Although the report concludes that [Force] is capable of at least sedentary employment, it also notes that she has 'significant impairments which may adversely affect return to work,' and states that digital tenderness mapping (DTM) results 'appear to be associated with a specific low back pain syndrome. This result appears to correlate with true medical impairment and disability. (JA 23 (internal citations omitted).)

Additionally, although the basis of the 2004 denial letter was Dr. Mark's independent review, Dr. Mark did not personally examine Force. Rather, he issued his findings based solely on the

contents of Force's medical file. The facts surrounding the 2004 denial letter are therefore nearly indistinguishable from those in *Calvert*, where this Court concluded that the denial of LTD benefits was arbitrary and capricious. 409 F.3d at 295-97. In *Calvert*, despite the evidence showing that Calvert was disabled, her employer denied her benefits by basing its decision on the opinion of a doctor, who reviewed Calvert's medical file but did not personally examine her. *Id*. at 296. This Court detected several flaws in the doctor's report because he "did not describe the data he relied on in reaching his conclusion" and "his conclusion suggested that he might have disregarded certain tests and examination results." *Id.* at 296-97.

In this case, Dr. Mark's report suffers from similar deficiencies. Dr. Mark did not provide a sufficient description of the data leading to his conclusion. Rather than pointing to specific medical examinations supporting his findings, he instead summarily stated that he determined Force's lack of disability "based on the information available for review and from a neurosurgical perspective." (Supp. JA 380.) The only clinical findings Dr. Mark referenced in any detail were "some limitation on [Force's] range of neck movement, a slightly decreased biceps jerk and some degree of central stenosis on C5/C6 on MRI." (*Id*.) Dr. Mark's letter does not make clear, however, whether he considered the results of the CT scan on January 25, 1997, Dr. Schwartz's findings of chronic pain syndrome and tendinitis of the right wrist, and Dr. Ortiz's finding of "some hypesthesia in the C2 on the right." (JA 257.) The vagueness of this description leads this Court to conclude that, as in *Calvert*, Dr. Mark may have disregarded, or at least discounted, certain tests and examination results.

3.    The Social Security Administration's Benefits Determination

Lastly, the district court was correct in factoring into its arbitrary-and-capricious calculus Ameritech's failure to consider the SSA's finding that Force was disabled and therefore entitled to disability benefits. To qualify for Social Security benefits a person must be disabled, which is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(2)(A). Under Ameritech's LTD Plan, a person is disabled if

> a sickness or injury . . . prevents the employee from performing the duties of his/her occupation or employment. "Disability" after the one year period immediately following the Waiting Period shall mean that the employee is *prevented by reason of such sickness or injury from engaging in any occupation or employment for which the employee is qualified, or may reasonably become qualified, based on training, education or experience.* An employee shall continue to be considered disabled if deemed incapable of performing the requirements of a job as a Salaried Employee other than one whose rate of pay is less than 50% of the employee's Base Pay at the time the disability commenced.

(JA 111 (emphasis added).)

Despite the definitional overlap between eligibility for Social Security benefits and eligibility for LTD benefits, Ameritech's 2004 decision to deny Force LTD benefits made no reference to the SSA's benefits determination. As this Court stated in *Calvert*, "the SSA determination, though certainly not binding, is far from meaningless." 409 F.3d at 294. In that case, the Court was persuaded that the SSA's determination of Calvert's eligibility for benefits was relevant because such a determination, "at a minimum, provides support for the conclusion that an administrative agency charged with examining Calvert's medical records found, as it expressly said it did, objective

support . . ." for a conclusion that Calvert was disabled. *Id.*; *accord Glenn*, 461 F.3d at 667 ("The courts have recognized that a disability determination by the [SSA] is relevant in an action to determine the arbitrariness of a decision to terminate benefits under an ERISA plan.").  Likewise, in this case, we are persuaded that the SSA's grant of benefits to Force constitutes objective support of her disability and that Ameritech's refusal to at least consider this determination is arbitrary and capricious.

## IV. CONCLUSION

For the preceding reasons, we **AFFIRM** the judgment of the district court.