*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 05a0219p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

---

LINDA GAIL CALVERT,

        *Plaintiff-Appellant,*

    *v.*

FIRSTAR FINANCE, INC., f/k/a STAR BANK
CORPORATION, and LIBERTY LIFE ASSURANCE
COMPANY OF BOSTON,

        *Defendants-Appellees.*

No. 03-5815

>

---

Appeal from the United States District Court
for the Western District of Kentucky at Bowling Green.
No. 02-00041—Joseph H. McKinley, Jr., District Judge.

Argued: August 6, 2004

Decided and Filed: May 17, 2005

Before: CLAY and GILMAN, Circuit Judges; O'MALLEY, District Judge.[*]

---

## COUNSEL

**ARGUED:** Zack N. Womack, WOMACK LAW OFFICES, Henderson, Kentucky, for Appellant.
Robert L. Steinmetz, FROST, BROWN & TODD, Louisville, Kentucky, for Appellees.
**ON BRIEF:** Zack N. Womack, WOMACK LAW OFFICES, Henderson, Kentucky, for Appellant.
Robert L. Steinmetz, FROST, BROWN & TODD, Louisville, Kentucky, for Appellees.

---

## OPINION

---

    O'MALLEY, District Judge. Linda Calvert claims that Liberty Life Assurance Company
of Boston ("Liberty") wrongfully terminated her long-term disability ("LTD") benefits in violation
of the Employment Retirement Income Security Act of 1974 ("ERISA"). *See* 29 U.S.C. §§ 1001-
1461. After reviewing the administrative record, the district court granted Liberty's motion for
judgment on the administrative record. Calvert appeals. While we agree with most aspects of the
district court's well-reasoned opinion, we disagree with its ultimate conclusion. We find that
Liberty acted arbitrarily and capriciously in denying Calvert further LTD benefits, and, thus,

---

[*] The Honorable Kathleen O'Malley, United States District Judge for the Northern District of Ohio, sitting by designation.

**REVERSE** the district court's judgment, and **REMAND** this matter for entry of judgment in favor of Calvert.

## *BACKGROUND*

For 18 years, Calvert worked as a mortgage loan officer in the Scottsville, Kentucky branch of Star Bank. As a Star Bank employee, she participated in a long-term disability insurance plan issued by Liberty.

Three time periods are relevant to the determination of benefits under this plan. First is the "Elimination Period," a period of 180 consecutive days of disability for which no benefit is payable. The second relevant time period covers the 24 months thereafter. To be deemed "disabled" for this second time period, an employee must be "unable to perform all of the material and substantial duties of his occupation."

After receiving LTD benefits for 24 months, the plan's definition of "disabled" becomes more strict. An employee is "disabled" under this final time period only if the employee "is unable to perform, with reasonable continuity, all of the material and substantial duties of his own or any other occupation for which he is or becomes reasonably fitted by training, education, experience, age and physical and mental capacity." The insured employee bears the burden of proving his or her continuing "disability."

In May 1998, Calvert suffered a back injury. On August 31, 1998, Calvert underwent a lumbar laminectomy and diskectomy. When she was discharged following surgery, her treating physician, Dr. Ray W. Hester, noted that he planned "to keep her off work probably six to eight weeks." Calvert, in fact, never returned to work after her surgery. She applied for LTD benefits in February 1999, which Liberty authorized and made effective that same month.

Although Dr. Hester noted after a follow-up visit in May 1999 that Calvert could "[t]ry sedentary work," he was of the opinion a month later that Calvert would never be able to work again. Dr. Hester's opinion was based, among other things, on x-rays and CT scans that indicated mild disc bulging and disc protrusion at the L5-S1 level. Dr. Hester opined that severe limitations on Calvert's ability to sit, stand, or walk make it impossible for her to perform either her past work, as a loan officer, or other similar duties.

Liberty asked Dr. Harold P. Smith, a neurosurgeon, to perform an independent medical evaluation of Calvert in August 1999. Dr. Smith was concerned with the symmetrical nature of Calvert's symptoms (e.g., pain, weakness, loss of muscle control in limbs, and extremities on both sides) and cautioned against any further surgery in light of that symmetry and her surgical history. Dr. Smith also found that Calvert suffered from certain limitations in her range of motion and ability to sit or stand for prolonged periods of time. Despite these concerns, however, Dr. Smith opined that Calvert "could *possibly* be employed with appropriate attention to breaks and gradual work conditioning program." He also recommended steroid injections, physical therapy, and/or water aerobics. After receiving Dr. Smith's report, Liberty continued to pay benefits to Calvert.

During this time period, Liberty informed Calvert that her continued receipt of benefits was conditioned upon her making an application for benefits from the Social Security Administration ("SSA"), which she did. In September 1999, SSA determined that Calvert was "totally disabled" as of August 29, 1998. The SSA concluded that Calvert could not perform her past relevant work as a loan officer, and did not have transferrable skills to perform other work within her residual functional capacity. Specifically, the SSA found that:

> Dr. Hester's medical assessment is consistent with the claimant's medical treatment, objective findings upon testing, clinical findings, and subjective complaints of pain.

. . . As Dr. Hester is the claimant's treating neurosurgeon and has treated the claimant consistently over a year, he is in a better position to know the claimant's limitations than the state agency physicians, who determined the claimant was capable of light exertional work. For this reason, the undersigned gives Dr. Hester's medical assessment controlling weight and adopts his assessment in this case. The claimant cannot perform her past relevant work as a loan officer and does not have transferable skills to perform other work within her residual functional capacity . . . . . Based upon the claimant's residual functional capacity for less than a full range of sedentary work, and vocational factors, there are no jobs existing in significant numbers that she can perform.

After she was awarded benefits by the SSA, Liberty demanded reimbursement of a portion of the benefits previously paid to Calvert on the grounds that the plan provides for a proportionate reduction in benefits whenever benefits are received from an alternative source – such as the SSA – for the same disability. Liberty was reimbursed $4,309.29 for a portion of the benefits paid between February 1999 and September 1999, the date of the SSA award. Thereafter, while Liberty continued to pay Calvert benefits, it apparently did so at a reduced level because of her simultaneous receipt of benefits from the SSA.

In April 2001, Liberty had Calvert undergo a functional-capacity evaluation (an "FCE") to assess her level of functioning and to determine her ability to return to "any occupation." Rob Pearse, an exercise physiologist and a certified ergonomic specialist, conducted the FCE, after which he concluded that Calvert could work, but that she should perform sitting tasks "only occasionally" and should avoid stooping or repeated bending. Pearse also noted that Calvert would "need to change positions from sitting to standing frequently. Sitting is her main functional limitation."

These results were used by a vocational rehabilitation specialist, Mary Titterington, in conducting a transferable-skills analysis for Calvert. While Titterington concluded that "the majority of [Calvert's] most transferrable skills require extensive sitting beyond her tested tolerances," there were some tasks Titterington felt Calvert could perform requiring minimal exertion. A representative sampling of jobs meeting this limitation included "drive thru bank teller; customer service representative; retail; security guard; cashier II; utility and government positions; bank loan officer." Following the transferable-skills analysis, Liberty requested a labor-market survey to determine whether any of these occupations were available in Calvert's vicinity. A number of such jobs were found to exist.

In a letter dated June 12, 2001, Liberty informed Calvert that her LTD benefits were being discontinued because she did not meet the policy's definition of "disability beyond 24 months." Liberty determined, based upon the functional-capabilities evaluation and the transferable-skills analysis that, with accommodations for her inability to sit or stand for long periods, or to stoop, bend or lift heavy items, Calvert was capable of performing certain "sedentary types" of work.

In a letter dated August 7, 2001, Calvert notified Liberty that she was appealing its denial of further LTD benefits. Accompanying Calvert's letter were two letters from Dr. Hester attesting to her continued disability, a report of a CT scan performed by Dr. Hester in July 2001, a personal statement prepared by Calvert in July 2001, Dr. Hester's treatment notes covering the period between April and July 2001, and a letter from Dr. Hester dated August 2, 2001 responding to Titterington's report.

In his August 2, 2001 letter, Dr. Hester reaffirmed his position that Calvert was unable to perform any work, and stated that "this lady requires the ability to lie down at times when the pain becomes worse, due to her increased activities and none of the positions [listed in Titterington's

report] would allow that sort of activity. I think she is not able to do these jobs which have been listed."

In response to her appeal, Liberty engaged Dr. Morris M. Soriano, a neurosurgeon, to review Calvert's medical records. Dr. Soriano reported that there were "no objective or clinical findings which support any restriction" on Calvert's work activity. According to Dr. Soriano, the primary diagnosis affecting Calvert's ability to work was her subjective complaints of lower back pain. Dr. Soriano stated that "[o]n an objective basis, . . . it should be noted that Ms. Calvert is capable of unrestricted work of any kind since she has always been objectively normal." Indeed, Dr. Soriano felt that Calvert was, and had always been, "able to perform her job as a loan officer full time without restriction or limitation." It is undisputed that, before reaching these conclusions, Dr. Soriano never physically examined Calvert.

After receiving Dr. Soriano's report, Liberty upheld its denial of further LTD benefits to Calvert. On November 20, 2001, Liberty wrote to Calvert's counsel and stated that "although Ms. Calvert reports subjective complaints of low back pain, left hip and leg pain, the objective clinical findings do not establish that her reported low back pain is of a nature and severity which would prevent her from performing the material and substantial duties of her own occupation or other occupations identified above. *There are no objective or clinical findings which support any restriction*." (emphasis added).

Calvert subsequently filed a complaint, pursuant to ERISA, in the United States District Court for the Western District of Kentucky. The district court affirmed Liberty's determination, concluding that the denial of further LTD benefits was not arbitrary or capricious. This timely appeal followed.

### *ANALYSIS*

**Standard of Review**

This Court reviews *de novo* an ERISA plan administrator's denial of benefits where the administrator has no discretion to determine benefits eligibility. *McDonald v. Western-Southern Life Ins. Co.*, 347 F.3d 161, 168 (6th Cir. 2003). If an ERISA benefits plan "gives the plan administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan," however, we review a decision to deny benefits under an "arbitrary and capricious" standard of review. *Id.* (internal quotation marks and citations omitted).

The parties agree that the plan at issue gives the plan administrator such discretionary authority. Specifically, the plan provides that

> Liberty shall possess the authority, in its sole discretion, to construe the terms of this policy and to determine eligibility hereunder. Liberty's decisions regarding construction of the terms of this policy and benefit eligibility shall be conclusive and binding.

"The arbitrary and capricious standard is the least demanding form of judicial review of administrative action." *McDonald,* 347 F.3d at 169 (internal quotation marks and citations omitted). Under this standard of review, the Court determines whether, in light of the plan's provisions, the plan administrator's decision was rational. "[W]hen it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious." *Id.* (internal quotation marks and citations omitted).

### The Effect of Liberty's Conflict of Interest

Although we must review Liberty's denial of benefits to Calvert under the highly deferential "arbitrary and capricious" standard, we must take into consideration the fact that Liberty is acting under a potential conflict of interest because it is both the decision-maker, determining which claims are covered, and also the payor of those claims. *Marks v. Newcourt Credit Group*, 342 F.3d 444, 457 (6th Cir. 2003). Liberty's ultimate disability determination was based upon the FCE of Robert Pearse and the file review of Dr. Soriano, both of whom Liberty selected and paid to assess Calvert's claim. As the plan administrator, Liberty had a clear incentive to contract with individuals who were inclined to find in its favor that Calvert was not entitled to continued LTD benefits. *See e.g., Darland v. Fortis Benefits Ins. Co.,* 317 F.3d 527, 527-528 (6th Cir. 2003). Considering Calvert's age, payment of this claim beyond the 24 month limitation period would be expensive for Liberty. As the district court noted, there was an incentive for Liberty to terminate coverage or deny the claim. Under such facts, "the potential for self-interested decision-making is evident." *Univ. Hosps. of Cleveland v. Emerson Elec. Co.*, 202 F.3d 839, 846 n. 4 (6th Cir. 2000).

"The 'possible conflict of interest' inherent in this situation 'should be taken into account as a factor in determining whether [Liberty's] decision was arbitrary and capricious.'" *Id*. (quoting *Davis v. Kentucky Finance Cos. Retirement Plan*, 887 F.2d 689, 694 (6th Cir. 1989), *cert. denied*, 495 U.S. 905 (1990)); *see also Firestone Tire and Rubber Co.,* 489 U.S. 101, 115 (1989); *Darland,* 317 F.3d at 527-528; *Whitaker v. Hartford Life and Accident Insurance Co.,* 121 Fed. Appx. 86, 87 (6th Cir. 2005)[1] (holding that a court is to factor an insurer's dual role into its review under the arbitrary and capricious standard, though the standard remains arbitrary and capricious). While several courts have altered the standard of review to something less deferential than the arbitrary and capricious standard where a benefits administrator is operating under a conflict of interest (*see e.g.*, *Adams v. Thiokol Corp.,* 231 F.3d 837, 842 (11th Cir. 2000)), this Court has not taken that approach. Instead, as noted, the standard remains unchanged and the conflict of interest is to be considered in *applying* that standard.[2]

### SSA's Determination of Total Disability

Calvert also contends that the SSA's determination that she was totally disabled must be considered in determining whether Liberty's decision was arbitrary and capricious. Indeed, Calvert argues that the SSA determination *conclusively* proves that Liberty's decision was arbitrary and capricious. For this proposition, Calvert primarily relies on *Darland, supra.* In that case, this Court found that it was inappropriate for the plan administrator to ignore the SSA award in making its benefits determination. This was true, the *Darland* panel found, for two reasons: (1) because it believed that the plan administrator had failed to follow the "treating physician rule," which generally requires deference to the opinions of treating physicians; and (2) because the plan administrator in *Darland* had asked the claimant to apply for SSA benefits so as to concomitantly

---

[1] *Whitaker* was originally issued by this Court as an "unpublished decision" filed on January 24, 2005, and assigned the above citation. This Court, however, later recommended the decision for full-text publication. As a formal "published" citation has not been assigned as of the writing of this opinion, we use the original "unpublished" citation herein.

[2] The Court would have a better feel for the weight to accord this conflict of interest if Calvert had explored the issue through discovery. While Calvert's counsel asserted that it was his understanding that discovery is never permissible in an ERISA action premised on a review of the administrative record, an exception to that rule exists where a plaintiff seeks to pursue a decision-maker's bias. *See e.g.,Wilkins v. Baptist Healthcare Sys., Inc*., 150 F.3d 609, 618 (6th Cir. 1998) ("The only exception to the . . . principle of not receiving new evidence at the district court level [in an ERISA case] arises when consideration of that evidence is necessary to resolve an ERISA claimant's procedural challenge to the administrator's decision, such as an alleged lack of due process afforded by the administrator or *alleged bias on its part*.") (emphasis added).

reduce its own payment obligations, effectively estopping it from arguing that the SSA determination was inaccurate. 317 F.3d at 529-33.

Calvert argues, that, as in *Darland*, Liberty gave insufficient weight to Dr. Hester's unequivocal opinion, and, again like *Darland*, Liberty required Calvert to apply for social security benefits and then benefitted from the SSA determination by seeking reimbursement for certain of the payments made to Calvert in light of the SSA award. Despite the obvious similarities between the facts here and those in *Darland*, however, Calvert asks us to read too much into *Darland*. This is true for two reasons.

First, as noted, central to the first prong of *Darland's* holding was this Court's conclusion that ERISA plan administrators are generally required, like the SSA, to give deference to the opinions of a claimant's treating physician. That principle has since been rejected by the United States Supreme Court, however. In *Black & Decker Disability Plan v. Nord,* 538 U.S. 822 (2003), the Supreme Court held that, while plan administrators may not arbitrarily reject or refuse to consider the opinions of a treating physician, they "are not obligated to accord special deference to the opinions of treating physicians." *Id.* at 825. Thus, the "treating physician rule" followed in *Darland* no longer applies in the ERISA context.[3] *See also Whitaker, supra,* 121 Fed. Appx. at 88 (holding that an ERISA plan administrator is not bound by an SSA disability determination when reviewing a claim for benefits).

This is not to say, however, as Liberty argues, that the SSA determination is meaningless and should be entirely disregarded. While it is true that the SSA must apply the "treating physician rule" in its determinations, that rule provides that deference is to be given to the opinions of treating physicians (over those of non-treating or reviewing physicians) where, *and only where*, there is objective support for those opinions in the record. *See Cutlip v. Secretary of H.H.S.*, 25 F.3d 284, 286-87 (6th Cir. 1994); *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985). Hence, the SSA determination, though certainly not binding, is far from meaningless. As the Court said in *Black & Decker,* a plan administrator may not arbitrarily disregard the medical evidence proffered by the claimant, including the opinions of her treating physicians. 538 U.S. at 834. Here, the SSA determination, at a minimum, provides support for the conclusion that an administrative agency charged with examining Calvert's medical records found, as it expressly said it did, objective support for Dr. Hester's opinion in those records.[4]

Second, although Liberty indeed benefitted from the SSA determination by seeking and receiving reimbursement from Calvert for a portion of the payments it previously made to Calvert, and it is clear that Liberty *required* Calvert to seek social security benefits for the very purpose of

---

[3]Specifically, the Supreme Court held:

> Plan administrators, of course, may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician. But, we hold, courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation.

*Id.* at 834.

[4]It is worth noting, moreover, that the Supreme Court's decision in *Black & Decker*, like this Court's decision in *Whitaker*, was premised on the concern that it would be improper for courts *automatically* to impose the same standards on a plan administrator which they impose on the SSA, because the definitions of "disability" employed by those decision-makers might differ. *See Whitaker, supra,* 121 Fed. Appx. at 88 ("a claim for benefits under an ERISA plan often turns on the interpretation of plan terms that differ from SSA criteria"). That concern is not at play in this case, however. To the extent there is any difference between the definitions of "disability" in the Liberty plan and that employed by the SSA in its benefits determinations, it is actually the SSA definition which is arguably narrower.

reducing its own obligations, we do not believe that *Darland* intended to apply the principles of judicial estoppel as broadly as Calvert asks us to do here. On facts similar to those here, *Darland* discussed the *concept* of judicial estoppel and expressed concern about the course of action taken by the plan administrator – i.e., availing itself of the benefits of an SSA award and then ignoring or repudiating that award when denying continued plan benefits. *Darland* went on to say, however, that "*though not directly applicable in this case*, the principles of judicial estoppel certainly weigh against *Fortis* taking such inconsistent positions." 317 F.3d at 516 (emphasis added). In reaching this conclusion, *Darland* relied on the Seventh Circuit's decision in *Ladd v. ITT Corp.,* 148 F.3d 753 (7th Cir. 1998), where, again on similar facts, Judge Richard Posner drew on the "penumbra of judicial estoppel" and concluded that a decision by a plan administrator to seek and embrace an SSA determination for its own benefit, and then ignore or discount it later, "casts additional doubt on the adequacy of their evaluation of . . . [a] claim, *even if it does not provide an independent basis for rejecting that evaluation.*" *Id.* at 756 (emphasis added).

It is apparent, accordingly, that while *Darland* and *Ladd* counsel a certain scepticism of a plan administrator's decision-making on facts such as those at issue here, they do not stand for the proposition, urged by Calvert, that a plan administrator is conclusively estopped from disagreeing with an SSA award whenever the plan benefits from such an award. Accordingly, the Court concludes that, contrary to Calvert's contention, the SSA's disability determination does not, standing alone, require the conclusion that Liberty's denial of benefits was arbitrary and capricious. The SSA determination to award benefits to Calvert is, instead, just one factor the Court should consider, in the context of the record as a whole, in determining whether Liberty's contrary decision was arbitrary and capricious.

### *Liberty's Reliance on a "File Review"*

Calvert also contends that Liberty acted improperly when it requested, and relied upon, a review of Calvert's medical file by Dr. Soriano, rather than on an in-person examination of Calvert. Calvert contends that the plan does not authorize a "pure paper" review. Specifically, Calvert relies on the following plan language:

> EXAMINATION
>
> Liberty, at its own expense, will have the right and opportunity to have a covered person whose injury or sickness is the basis of a claim examined by a physician or vocational expert of its choice.

Although this provision *allows* Liberty to commission a physical examination of a claimant, there is nothing in the plan language that expressly *bars* a file review by a physician in lieu of such a physical exam. We are unpersuaded by Calvert's request that we read such a ban into the plan and, therefore, refuse to reject Dr. Soriano's conclusions on that ground alone.

Rather, as with the other factors upon which Calvert relies to attack Liberty's decision-making process, we regard Liberty's decision to conduct a file review rather than a physical exam as just one more factor to consider in our overall assessment of whether Liberty acted in an arbitrary and capricious fashion. Thus, while we find that Liberty's reliance on a file review does not, standing alone, require the conclusion that Liberty acted improperly, we find that the failure to conduct a physical examination – especially where the right to do so is specifically reserved in the plan – may, in some cases, raise questions about the thoroughness and accuracy of the benefits determination. The extent to which we find it does so here is discussed *infra*.

*Application of the Arbitrary and Capricious Standard in this Case*

As noted, Calvert was injured in May 1998, resulting in back surgery. The pre and post-operative diagnoses were the same: lumbar spondylosis with ruptured disc, L5-S1, right. Thereafter, Calvert continued to experience a variety of problems associated with her injury and surgery, including but not limited to: weakness in both legs, at times causing sudden collapse of one or both legs; radiating pain to her extremities, including her fingers and toes; pain in her hips; problems with urination; and an inability to sit for more than 2-3 minutes at a time without extreme pain. All of these symptoms are documented repeatedly throughout her medical records.

A CT scan on June 3, 1999 showed "a broad posterior and leftward disc protrusion, likely a herniation, appear[ing] to compress the left S1 nerve root sleeve" . . . and "a nerve root cyst in the sacral area as well." A follow-up CT scan on July 5, 2001 found: "a mild to minimal left lateral disc bulge" and "facet asteoarthropathy" at L2-3; a "right lateral bulge" and "facet joint osteoarthropathy and hyperthropy" at L3-4; "spinal stenosis" at L4-5; and "circumferential and broad-based posterior disc bulge," contacting both S1 nerve roots, "posterior osteophyte," and a moderate narrowing of the "left lateral recess."

These tests, along with repeated physical examinations of, and discussions with, Calvert regarding her complaints of on-going pain and limitations on her mobility, led the treating physician, Dr. Hester, a neurosurgeon, to conclude that she was unable to perform any form of work. Pointing to the existence of objective data in the record as support, the SSA agreed with Dr. Hester's opinion and determined that Calvert was totally disabled by virtue of her back injury and resultant condition.

In the face of these facts and conclusions, Liberty denied Calvert benefits because it found that there was *no* objective data in the record to support the conclusion that Calvert suffered from *any* disability or *any* functional limitation. In its November 20, 2001 letter conveying this conclusion, Liberty relied almost exclusively on the conclusions Dr. Soriano reached after his file review. For a number of reasons, we find that Liberty's benefits determination was not based on a reasoned or rational reading of the record before it, and was arbitrary and capricious in light of the actual record evidence.

First, as noted above, we find nothing inherently objectionable about a file review by a qualified physician in the context of a benefits determination. In the context of this case, however, the file review conducted by Dr. Soriano was clearly inadequate. While Liberty contends that it asked Dr. Soriano to review Calvert's entire file, and asks us to assume, therefore, that he did so, nothing in his report supports that conclusion. The report itself, and the conclusions he reached, mandate a contrary conclusion.

Dr. Soriano does not describe the data he reviewed in reaching his conclusion. Pointedly, he makes no mention of the surgical reports, x-rays or CT scans in the record. Indeed, it appears that Dr. Soriano was not even aware that Calvert's initial surgery was prompted by an injury resulting in objectively calculable harm to her spine. Surprisingly, moreover, Dr. Soriano's report suggests that a functional capacity evaluation "might be of some value," indicating that, despite claiming to have made a "thorough" review of the record, he did not, in fact, review the FCE which had already been done. Had he done so, he would have seen that the FCE did, in fact, conclude that Calvert suffered from certain functional limitations.

In addition to these gaps in his report, Dr. Soriano does not mention the SSA disability determination at all, even to discount or disagree with it, which indicates that he may not even have been aware of it. And, while he does mention Drs. Hester and Smith by name, he does not explain

why their conclusions that Calvert suffered from some degree of functional limitation (substantial or moderate, depending upon the doctor) were rejected out-of-hand.[5]

Based on this review, Dr. Soriano reaches two conclusions, which are incredible on their face. First, he concludes that all of Calvert's claimed limitations in range of movement and claims of pain are *subjective exaggerations* – i.e., that her claims were not credible. This he concludes despite never having met or examined Calvert, and despite the fact that Dr. Hester, with a full understanding of Calvert's history, and Dr. Smith, after conducting a physical exam of Calvert, did not reach that same conclusion.[6] Second, Dr. Soriano asserts that there was *no objective data* in the record to support *any* restriction on her activities. This conclusion simply does not square with the verifiable objective results of her x-rays and CT scans; again, results Dr. Soriano never mentions and may never have seen. It is also directly contrary to the conclusions reached by Dr. Hester, Dr. Smith and the SSA; again, conclusions which Dr. Soriano never addresses head-on and simply seemed to ignore. It is, moreover, inconsistent with the finding of relatively restrictive functional limitations found by Mr. Pearse after the FCE.

It is against this backdrop that we must determine whether Liberty acted arbitrarily and capriciously in denying further disability benefits to Calvert. When we compare Dr. Soriano's file review and conclusions to the thorough *objectively verifiable* determinations of the SSA and Calvert's treating physician, and consider, as we must, both Liberty's conflict of interest and the benefit it received from encouraging and relying upon the SSA disability determination, we find that Liberty acted arbitrarily and capriciously and that its decision denying long-term disability benefits to Calvert must be reversed.

## *CONCLUSION*

For the reasons set forth above, we **REVERSE** the district court's order affirming Liberty's denial of benefits, and denying Calvert's request for the same, and **REMAND** for entry of an order requiring Liberty to award benefits plus interest from the date on which her benefit payments ceased.

---

[5] As noted, even Dr. Smith was of the view that Calvert suffered from functional limitations which restricted her ability to sit, stand or walk for sustained periods.

[6] As we said, there is nothing inherently improper with relying on a file review, even one that disagrees with the conclusions of a treating physician. Where, as here, however, the conclusions from that review include critical credibility determinations regarding a claimant's medical history and symptomology, reliance on such a review may be inadequate.