NOT FOR FULL-TEXT PUBLICATION
File Name: 06a0390n.06
Filed: June 2, 2006

NO. 05-5798

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

MICHAEL W. NOLAND,

      Plaintiff-Appellant,

v.

THE PRUDENTIAL INSURANCE
COMPANY OF AMERICA,

      Defendant-Appellee.

_____/

ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE WESTERN
DISTRICT OF KENTUCKY

BEFORE:    SUHRHEINRICH, GILMAN, and ROGERS, Circuit Judges.

      **PER CURIAM.** Appellant Michael W. Noland appeals from the order of the district court upholding Defendant Prudential Insurance Company's ("Prudential's") decision to deny his claim for additional long-term disability benefits in this action for alleged wrongful denial of benefits under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001-1461. For the following reasons, we AFFIRM.

**I. Background**

      Noland worked as a quality auditor at KPMG Peat Marwick LLP ("KPMG"), and was an eligible employee under KPMG's employee long-term disability policy provided by Prudential.

      In October 2000, and again in December 2000, Noland was hospitalized for pneumonia and was unable to work for several months. On January 17, 2001, Noland applied for disability benefits

-1-

under the Prudential policy.[1]  Along with his claim; Noland submitted an "Attending Physician's Statement" ("APS") that listed "bilateral pneumonia and respiratory failure" as the conditions that prevented Noland from working.  The APS indicated that the usual duration of the condition was one month.  The statement also noted a history of acute myocardial infarction from April 2000 and depression from March 2000.

On June 21, 2001, Prudential approved Noland's application for long-term disability benefits.  Noland was also awarded Social Security disability benefits on May 31, 2001, with a commencement date of December 22, 2000.

On January 16, 2002, Noland again saw his cardiologist, Dr. Abraham Joseph.  Dr. Joseph performed a catheterization.  Dr. Joseph noted, "There appears to be no overt cause for this patient's

---

[1]The policy defines "Total Disability" as follows:

"Total Disability" exists when Prudential determines that all of these conditions are met:

(1) Due to Sickness or accidental injury, both of these are true:

> (a) You are not able to perform, for wage or profit, the material and substantial duties of your occupation.

> (b) After the Initial Duration of a period of Total Disability, you are not able to perform for wage or profit the material and substantial duties of any job for which you are reasonably fitted by your education, training or experience.  The Initial Duration is shown in the Schedule of Benefits.

(2) You are not working at any job for wage or profit.

(3) You are under the regular care of a Doctor.

acute symptoms of shortness of breath and fatigue, nor is there any evidence of significant pulmonary hypertension to suggest a secondary pulmonary etiology."

On January 31, 2002, Prudential informed Noland that it was discontinuing his disability benefits as of May 1, 2002, because Prudential had determined that he no longer met the criteria for long-term disability. In that letter, Prudential explained that it had reviewed Noland's medical records from Taylor County Hospital, as well as medical information from Noland's physicians, Dr. El-Asyouty, Dr. Joseph, Dr. Geeverghese, and Dr. Garner. Prudential relied on Dr. Joseph's January 16, 2002 finding of no overt cause for Noland's symptoms. Prudential noted that Dr. Geevarghese's report reflected that Noland did not have any side effects or impairments arising from his pain medications, and that while an MRI showed findings of cervical disc disease, there was no indication that Noland's condition had changed from when he was working. Regarding Dr. El-Asyouty's report, Prudential noted that while Noland reported symptoms of anxiety and depression, there was no documentation that this condition was severe enough to prevent him from working. Prudential remarked that the records from Taylor County Hospital showed that Noland was hospitalized with pneumonia in October 2001, but that "as of October 25, 2001, the diagnostic testing showed that Noland had near complete resolution of [his] right upper lobe infiltrate."

Thus, Prudential's assessment of the medical documentation on file was that Noland stopped working due to respiratory failure, this condition presented a closed period of disability, and Noland had recovered from this condition. Prudential concluded that while Noland had conditions that might require ongoing medical treatment, they did not prevent him from performing his occupation. Prudential therefore terminated Noland's benefits as of May 1, 2002.

Noland sought reconsideration of Prudential's decision, which Prudential denied by letter

dated April 1, 2002. Prudential acknowledged Dr. Garner's opinion that Noland was unable to work because of disabling fatigue, Dr. El-Asyouty's opinion that Noland's depression worsened when he was working and the doctor's recommendation of disability for depression, and Dr. Dao's statement that Noland had severe obstructive sleep apnea requiring the use of a BiPap machine and the doctor's opinion that the combination of Nolan's cardiopulmonary condition and sleep apnea precluded work. Nonetheless, Prudential concluded that Noland was capable of performing his occupation:

> In January, 2002, you were seen by a cardiologist, Dr. Joseph, who indicated there appears to be no overt cause for your acute symptoms of shortness of breath and fatigue, nor is there any evidence of significant pulmonary hypertension to suggest a secondary pulmonary etiology. The January, 2002 pulmonary function test indicates mild restriction. The medical records indicate severe sleep apnea for which you are using a BiPap machine. There is no indication that your sleep apnea is not under control with the use of the BiPap. Further the BiPap machine is portable and adaptable to travel.
>
> With regard to depression, Dr. El-Asyouty indicates your condition worsens when working. This does not support a current disabling mental impairment. You have been treating for depression for several years during which time you continued to work. There is no documentation of a significant change in your mental condition that would prevent you from performing your occupation while continuing with treatment.

Thus, Prudential concluded that "the medical records did not document a current sickness or injury that would prevent [Noland] from performing [his] occupation while continuing with treatment for [his] symptoms."

Noland appealed again. This time Prudential hired Dr. Howard Kipen, an outside physician specializing in environmental and occupational medicine, to review Noland's records. On August 2, 2002, Dr. Kipen submitted a report to Prudential. Dr. Kipen reviewed the medical records of each of the treating physicians and concluded: "Mr. Noland suffers from identified medical problems

without identified medical limitations that would come close to making him disabled." Dr. Kipen observed that Noland also suffers from "identified psychiatric problems which may, but [were] not shown to, confer a degree of impairment . . . related to his cardiac condition." Further, Dr. Kipen remarked that Noland suffered from musculoskeletal limitations, but to the extent they had been specified, the limitations would not confer a substantial degree of disability. Dr. Kipen further stated, "Dr. Gardner's own APS [attending physician's statement] from 4/9/02 seems to indicate that Mr. Noland could perform sedentary work without restrictions, and I see no medical restrictions for Mr. Noland in terms of sedentary work."

Because his report contradicted their opinions, Prudential sent Dr. Kipen's report to two of Noland's treating physicians, Dr. Garner and Dr. Geevarghese, for response. Neither gave a substantive response. On September 30, 2002, Prudential notified Noland that it was upholding the termination of the long-term disability benefits on the basis of Dr. Kipen's report. The letter concluded that "[w]hile we have taken the opinions of your physicians into consideration, our review of the medical file, in conjunction with Dr. Kipen's file review, does not document a current sickness or injury that would prevent you from performing your occupation while continuing with treatment for your symptoms."

Noland appealed again in November 2002. On December 27, 2002, KPMG notified Noland that because Prudential had terminated his long-term disability benefits on May 1, 2002, and Noland had not returned to work with KPMG, his employment was terminated effective December 30, 2002.

In March and June of 2003, Noland sent additional records to Prudential. These included a copy of Noland's Social Security disability benefits letter; records from his April 12, 2000 hospitalization due to myocardial infarction; various 2003 treatment records; and a follow-up letter

stating that Noland had continued treatment with Dr. El-Asyouty, underwent an endartectomy for carotid stenosis, and had masses in his lung and thyroid.

Prudential sent a final denial letter on June 23, 2003. In addition to reiterating its previous conclusions, Prudential made the following conclusions regarding the new submissions:

> On January 16, 2003, Mr. Noland underwent a carotid ultrasound. According to the result, the test was performed due to Mr. Noland's history of carotid bruit, and not symptoms such as TIA, dizziness or stroke. According to your letter, this procedure was performed on April 28, 2003. The maximum duration for this procedure is typically 35 days and it would be expected that a period of impairment would exist from April 28, 2003 until approximately May 26, 2003. Further impairment related to this condition would not be expected.

> Included on appeal is a February 26, 2003 letter from Dr. Dao indicating impairment due to severe restrictive lung disease and severely abnormal PFTs. The PFT's in file, dated January 8, 2002 revealed only mild disease, and the February 14, 2003 CT scan did not reveal significant pathology. Changes noted in the CT scan included mediastinal lymphadenopathy, bibasilar airspace opacity and 5mm pulmonary nodule. Although Dr. Dao opines as to Mr. Noland's level of impairment, the changes on the CT scan are not significant to account for the reported symptoms of shortness of breath or a need for oxygen.

> Although you indicate that Mr. Noland was hospitalized in January 2003 for chest pain and fluid in the lungs, there is no documentation of these visits. It would be expected that if Mr. Noland was unstable from a cardiac perspective, he would have undergone a complete workup within the first six months of 2003.

Noland brought suit in state court. Prudential removed it to federal district court on the basis of federal question jurisdiction. The parties filed cross motions for summary judgment. The district court granted Prudential's motion and denied Noland's. The court concluded that "the decisions of Prudential to deny Noland further benefits under the plan was not arbitrary and capricious, but rather were thoroughly investigated and reasonably substantiated by specific citation to medical findings." (J.A. 30.) Noland appeals.

## II. Standard of Review

This Court reviews the denial of benefits under § 502(a)(1)(B) [29 U.S.C. § 1132(a)(1)(B)] de novo "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). "When a plan affords discretion to an administrator or fiduciary, the arbitrary and capricious standard of review applies." *McCartha v. Nat'l City Corp.*, 419 F.3d 437, 441 (6th Cir. 2005) (and citations therein).

Prudential's plan reserves for itself the discretion to make factual determinations. The plan states that benefits are granted only "when Prudential determines that all of these conditions are met . . . ." Such language reserves discretionary authority to Prudential. *Cf. Perez v. Aetna Life Ins. Co.*, 150 F.3d 550, 556 (6th Cir. 1998) (en banc) (holding that language stating that the insurer "shall have the right to require as part of the proof of claim satisfactory evidence" conferred discretion); *Yeager v. Reliance Standard Life Ins. Co.*, 88 F.3d 376, 381 (6th Cir. 1996) (finding that language stating that claimant must submit "satisfactory proof of Total Disability to us" conferred discretion); *see also Green v. Prudential Ins. Co of Am.*, 383 F. Supp.2d 980, 990-91 (M.D. Tenn. 2005) (finding this exact language to confer discretion so as to trigger the arbitrary and capricious standard of review); *Adams v. Prudential Ins. Co. of Am.*, 280 F. Supp.2d 731, 736 (N.D. Ohio 2003) (same; and cases discussed therein).

Under the arbitrary and capricious standard of review, this Court determines whether, in light of the plan's provisions, the plan administrator's decision was rational. *McDonald v. Western-Southern Life Ins. Co.*, 347 F.3d 161, 168 (6th Cir. 2003). "[W]hen it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious." *Id.* (internal quotation marks and citations omitted). In making this determination, the

court is limited to reviewing only those materials in the administrative record.  *Peruzzi v. Summa*

*Med. Plan*, 137 F.3d 431, 433-34 (6th Cir. 1998).

### III.  Analysis

### A. Conflict of Interest

Noland argues that a conflict of interest exists because Prudential both decides the claims

and pays the benefits.  This Court has recognized a conflict of interest when a claims administrator

both funds and administers the plan. *Calvert v. Firstar Fin., Inc.,* 409 F.3d 286, 292 (6th Cir. 2005)

(and citations therein); *Killian v. Healthsource Provident Adm'rs, Inc.,* 152 F.3d 514, 521 (6th Cir.

1998).  This conflict does not alter the standard of review, however, but merely becomes a factor

in determining whether Prudential's decision was arbitrary and capricious.  *Calvert*, 409 F.3d at 292-

93.

As the district court pointed out, the evidence belies any assertion that Prudential acted

unfairly.  Prudential not only conducted an in-house clinical review of Noland's medical records,

but employed an outside physician specializing in occupational medicine to conduct an independent

review.  In addition, Prudential offered Noland's physicians the opportunity to comment on the

report which they failed to do.  Finally, Prudential awarded Noland benefits for one year.  In short,

this factor does not reflect arbitrary or capricious decisionmaking by Prudential.

### B.  Termination of Benefits

Noland argues that the district court erred in affirming Prudential's decision to terminate his

long-term disability benefits because all of the physicians who evaluated or treated him agreed that

he is totally and permanently disabled.  However, under the arbitrary and capricious standard of

review, we are limited to determining whether the administrator's decision was rational in light of

the record before it.  We conclude that it was.  As the district court held, "[a]s evidenced by the evaluative process recited above, the decisions of Prudential to deny Noland further benefits under the plan were not arbitrary and capricious, but rather were thoroughly investigated and reasonably substantiated by specific citation to medical findings."  Prudential's initial denial on January 31, 2002 stated that Noland had recovered from the pneumonia and respiratory failure–the conditions which caused him to stop working–and specifically referenced Dr. Joseph's January 16, 2002 note stating that there appeared to be no cause for Noland's acute symptoms of shortness of breath or fatigue, nor any evidence of significant pulmonary hypertension to suggest a secondary pulmonary etiology.  Dr. Joseph's note also showed that the cardiac condition was largely resolved.  The January 31, 2002 letter also indicated that Prudential had reviewed Noland's job description as a quality auditor for KPMG and that his medical condition would not preclude him from performing his job.  Prudential observed that running, the only essential physical activity Noland identified in his job description, was not a material and substantial duty of the job.

Dr. Garner's conclusion that Noland suffered chronic fatigue was, as Prudential found in its denial letter dated April 1, 2002, contradicted by Dr. Joseph's January 2002 diagnosis.  Similarly, as Prudential observed in that same letter, Dr. Dao's finding of severe obstructive sleep apnea did not indicate that it was not under control with the use of the BiPap, which is portable.  Regarding Dr. El-Asyouty's conclusion that Noland suffered from disabling depression, Prudential correctly observed that there was no documentation of a significant change in Noland's medical condition to preclude him from working.

Dr. Kipen's report supports Prudential's denial on September 30, 2002.  Dr. Kipen reviewed the medical records.  Regarding pain management, he noted that Dr. Geevarghese himself did not

draw any conclusions about Noland's claimed disability. Dr. Kipen observed that Dr. Garner's own APS statement indicated that Noland had the ability to perform sedentary work. In addition, Dr. Kipen observed that "it was unclear why Dr. Garner relies on the less accurate and older echocardiogram rather than the gold standard left ventriculogram described above, leading him to assert a non-existent cardiomyopathy." Dr. Kipen also observed that a PFT from January 8, 2002, documented only a single trial that was not compliant with ATS standards and was therefore an invalid study.[2] Dr. Kipen found no documentation to support a conclusion that Noland was disabled from working based on his mental condition. Finally, Dr. Kipen offered two of Noland's physicians an opportunity to comment and refute his conclusions, and they failed to do so. Thus, there is objective evidence in the record to support Prudential's decision.

In addition to Dr. Kipen's report, which considered earlier medical records, Noland's medical records from June 2 through June 4, 2002, further supported the finding that Noland was no longer disabled. During a hospitalization for alleged chest pain, Noland's cardiologist, Dr. Joseph, concluded that Noland "presented with atypical chest pain with no evidence of myocardial injury through serial EKGs and enzymes. . . . I have low index suspicion that any of his symptoms are cardiac in origin given his recent negative catheterization and the lack of findings on either his

---

[2]Dr. Kipen stated:

> A PFT from 1/08/02 documents only a single trial, not compliant with ATS standards, and the time/volume curve indicates that volume was still rising, and had not plateaued, when exhalation ceased. This makes the study invalid. Also, no bronchodilator was administered. FVC was 62% predicted, with FEV1 65% predicted and ratio of 86%. Computer interpretation was mild chest restriction, no obstruction noted or indicated, and the printout also gave a 'lung age' of a 79 year old.

enzymes or his EKGs." The radiology report from that visit showed that Noland's heart size and pulmonary vasculature were within normal limits, and that the lungs were clear "of an acute process." (J.A. 306.) A follow-up x-ray from August 2002 confirmed: "Single portable view of the chest does not show failure, pneumonia or effusions. The heart size is normal. Previous coronary artery bypass surgery. . . . IMPRESSION: No change or development of acute cardiopulmonary disease."

There was also evidence to support Prudential's final denial. In the letter dated June 23, 2003, Prudential addressed Noland's newly submitted materials and explained why each item did not require Prudential to reverse its decision to deny benefits.

In short, despite "identified medical limitations," the record evidence demonstrated that the pulmonary and cardiac illness that formed the basis of Noland's benefits had been substantially resolved as of January 2002, and that no other medical evidence supported a finding of total disability. In sum, then, as the district court concluded, "It cannot be said that [the ultimate denial of benefits] lack[ed] a reasonable basis in light of the evidence."

### C. Social Security Disability Determination

Noland asserts that the inconsistency between the district court's decision and the Social Security Administration's decision supports his argument that Prudential's decision was arbitrary and capricious, relying on our decision in *Darland v. Fortis Benefits Ins. Co.*, 317 F.3d 516, 532 (6th Cir. 2003). The Supreme Court effectively overruled *Darland* in *Black & Decker Disability Plan v. Nord*, 538 U.S. 822 (2003). *Nord* holds that the treating physician rule does not apply in the ERISA context. Instead, the Social Security Administrator's decision becomes one factor for the court to consider in determining whether an insurer's contrary decision was arbitrary and capricious.

-11-

*Calvert,* 409 F.3d at 295. This is also true when the insurer requires the insured to apply for social security disability benefits. *See id.* at 294-95 (rejecting the insured's argument that the plan administrator was effectively estopped from asserting that the Social Security Administration determination was inaccurate because the administrator had asked the claimant to apply for Social Security benefits so as to concomitantly reduce its own patient obligations). This contention is without merit.

## D. Prudential's Reliance on a File Review

Noland complains that Prudential acted arbitrarily in relying on Dr. Kipen's file review, especially since Dr. Kipen never examined Noland. As we held in *Calvert*, an insurer's decision to conduct a file review rather than a physical exam is simply a factor to consider in the overall assessment of the decisionmaking process. *Calvert*, 409 F.3d at 295. For all of the reasons discussed above, Prudential's decisionmaking process, including reliance on Dr. Kipen's report, was not arbitrary or capricious.

## IV. Conclusion

For all of the foregoing reasons, the decision and judgment of the district court is **AFFIRMED.**