**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**August 19, 2008**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

MATHEW B. CHALKER,

Plaintiff-Appellant,

v.

RAYTHEON COMPANY;
RAYTHEON COMPANY LONG-
TERM DISABILITY PLAN;
RAYTHEON EMPLOYEES
DISABILITY TRUST;
METROPOLITAN LIFE INSURANCE
COMPANY,

Defendants-Appellees.

No. 07-4069
(D.C. No. 2:05-CV-00869-TS)
(D. Utah)

---

**ORDER AND JUDGMENT**[*]

---

Before **BRISCOE**, **EBEL**, and **MURPHY**, Circuit Judges.

Plaintiff-Appellant Mathew Chalker appeals the district court's entry of

judgment based on the administrative record in favor of Defendants-Appellees

Raytheon and Metropolitan Life Insurance Company ("MetLife"). This case

arises out of Chalker's allegation that Defendants wrongfully terminated his long-

---

[*] This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel. It may be cited,
however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th
Cir. R. 32.1.

term disability benefits under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132. The district court disposed of Chalker's claims on two grounds: (1) Chalker's suit was time-barred by a one-year contractual limitations period contained in the company's Long-Term Disability Plan ("the Plan"), and (2) even if Chalker's suit were not time-barred, MetLife's decision to terminate Chalker's benefits was not arbitrary and capricious. Chalker now appeals. We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and AFFIRM.

## I. BACKGROUND

From 1977 until 2000, Chalker was employed in Raytheon's Human Resources Department, eventually serving as the Department's Senior Manager. While with Raytheon, Chalker participated in the Plan. The Plan is sponsored and administered by Raytheon, while MetLife is the long-term disability ("LTD") claims administrator. As the LTD claims administrator, MetLife determines "all claims for [b]enefits and questions which may arise under the Plan with respect to the payment of [b]enefits...." The Plan specifically provides that these decisions "shall be conclusive and binding on all persons, unless a court of competent jurisdiction determines that [MetLife's] decision was arbitrary or capricious." MetLife has no financial obligations under the Plan, which is funded exclusively by Raytheon employees.

As provided for in the Plan, an individual is considered disabled "for the first 15 months [he] is receiving LTD benefits if [he is] unable to perform the

essential elements of [his] job with reasonable accommodation." Once this 15-month period has expired, an individual continues to be eligible for LTD benefits only if he is "unable to work at *any job* for which [he is] reasonably qualified by training, education or experience...." While receiving benefits, an individual may be asked to "provide proof of [a] continued disability."

Individuals who believe they have been wrongfully denied benefits under the Plan may commence civil actions after exhausting a number of administrative remedies. However,

> no action at law or in equity shall be brought to recover Benefits under the Plan prior to expiration of sixty (60) days after a claim has been filed in accordance with the requirements of the Plan, nor shall an action be brought at all unless within one (1) year after expiration of the time permitted under the Plan for furnishing proof of disability to the Claims Administrator.

This information is not contained in the Summary Plan Description ("SPD").

In November of 2000, Chalker became unable to continue his employment with Raytheon due to a variety of medical difficulties. Chalker thereafter requested LTD benefits; MetLife initially approved those benefits in February of 2001. At this time, Chalker was diagnosed with major depressive disorder, generalized anxiety disorder, and fibromyalgia.

Over the next year, Chalker's condition showed little improvement. In May of 2002, Katherine Thompson, Chalker's clinical nurse specialist, asserted that Chalker was "not anywhere [near] ready to [return to work] due to his physical

- 3 -

condition…." Similarly, in December of that same year, Dr. McBride, Chalker's treating physician, asserted that Chalker's "physical abilities are poor but improving languidly. At this time, [Chalker] cannot perform any job." Eight months later, in August of 2003, Chalker's condition still had not improved. To that effect, Dr. Jepson, Chalker's subsequent treating physician, noted that Chalker could not "perform any activity for more than 5-10 minutes" and was to "avoid completely" standing, sitting, or reaching, among other activities. Based on such concerns, MetLife continued Chalker's LTD benefits.

Some time later, in February of 2004, Chalker underwent a Facility Capacity Evaluation ("FCE") at MetLife's direction. As part of the FCE, Chalker was asked to perform 21 different physical tasks, including pushing, pulling, and sitting. According to John Michael Orr, the FCE administrator, Chalker "participated fully in 2 out of 21 tasks ... and demonstrated self-limiting participation by stopping tasks early due only to reasons of pain on 19 out of 21 tasks...."

Based on Chalker's performance during the FCE, Orr opined that Chalker was "capable of performing physical work at the **<u>Light level</u>**, as defined by the U.S. Department of Labor...." Orr further noted that "[t]his overall level of work is merely a guideline, if accommodations are made based on the specific abilities and tolerances demonstrated, other levels of work may be feasible." Nevertheless, Orr concluded that "[g]iven [Chalker's] tendency toward self-

- 4 -

limiting physical demands secondary to increasing pain levels and his reduced position tolerances for sustained sitting and standing, it [was] difficult to predict whether Mr. Chalker could maintain the Sedentary level of work for the 8-hour day."

Orr's basic conclusions were supported by Dr. Tracey Schmidt, an independent physician consultant ("IPC") to whom MetLife provided the results of Chalker's FCE. According to a report prepared by Dr. Schmidt, who is Board Certified in Internal Medicine and Rheumatology, Chalker

> was given a light work capacity [on the FCE] due to significant self-limiting behavior. Therefore, this represents a minimum, not a maximum, work capacity.... By self-limiting on the FCE, no maximum work capacity could be ascertained, but there was no objective evidence [Chalker] would be unable to work in a light capacity on a full-time basis.

On the heels of Dr. Schmidt's report, in May of 2004, MetLife obtained an Employability Assessment and Labor Market Analysis regarding Chalker. This analysis concluded that "Chalker possesse[d] transferable skills and aptitudes and temperaments for other occupations" and that "3 [such] potential occupations for which Mr. Chalker [was] qualified" existed in his geographic area. Each of these potential occupations required a light level of physical exertion and involved managerial responsibilities.

In light of the Employability Assessment and Labor Market Analysis, in June of 2004, MetLife informed Chalker that "[b]ased upon a thorough and

extensive review and evaluation of all the medical information submitted by [Chalker], [his] physicians, and all the documentation contained in [Chalker's] claim file," Chalker no longer qualified for LTD benefits under the Plan.  In reaching this decision, MetLife cited the FCE, Dr. Schmidt's report, and the Employability Assessment and Labor Market Analysis.  MetLife's letter concluded that

> in view of the above, we have determined that the medical evidence
> submitted does not support the existence of a totally disabling
> condition preventing you from performing any and all occupations
> for which you are reasonably qualified....  Therefore, under the terms
> of the Plan, we have no alternative but to terminate your benefits
> effective May 28, 2004.

In July of 2004, Chalker appealed MetLife's decision.  According to Chalker, "[a] significant portion of the medical evidence was left out of [his] file and was not considered during the first review, which led to an incorrect conclusion about [his] disability."  Chief among this evidence according to Chalker was a Statement of Functional Capacity ("SFC") completed by Dr. Jepson, asserting that Chalker was "'totally disabled for any occupation for an indefinite period of time.'"  Chalker also offered letters from Drs. Jepson and McBride indicating that he was totally disabled and unable to perform any job. Dr. Jepson's letter specifically took issue with the FCE:

> With regard to [Chalker's] functional capacity evaluation on
> February 5, 2004, I think MetLife should be aware that he suffered
> for several days with a post-activity spasm pain known as "after
> discharge" pain.  He was in bed for several days afterwards.  During

the evaluation itself he had to rest in a combination of lying down and sitting for about 120 minutes. He was only able to perform activities for about 60 minutes. Therefore, it seems impossible that [Chalker] would be able to work eight hours each day, five days a week.

Thus, Dr. Jepson opined that Chalker was "completely and permanently disabled from any occupation...."

Following its receipt of Chalker's appeal, in August of 2004, MetLife obtained an additional report from another IPC, Dr. Elinor Mody (who like Dr. Schmidt, is Board Certified in Internal Medicine and Rheumatology). According to Dr. Mody's report, she had a telephone conversation with Dr. McBride, in which Dr. McBride allegedly asserted that "Chalker had no inflamed joints and all of his disabling diagnosis were subjective. Mr. Chalker has improved quite a bit on medication. He can now walk down the stairs without difficulty; initially he would not even leave the bed." In light these remarks and the additional information contained in the various reports concerning Chalker, Dr. Mody concluded that "[t]here is no clear medical evidence in terms of [Chalker's] physical health to support recommending against all work. Mr. Chalker has, again, no abnormal joint findings and no significant cardiovascular disease that has been documented. Therefore, there are no obvious adverse consequences that come to mind from performing a sedentary job." Thus, although Dr. Mody agreed with the FCE and Dr. Schmidt that Chalker was capable of some level of work, she believed this work could be at the sedentary level.

In light of Dr. Mody's conclusion that Chalker was capable of sedentary work as opposed to light level work, in September of 2004, MetLife obtained a new Employability Assessment and Labor Market Analysis for Chalker. This analysis concluded that there were four available positions involving sedentary work for which Chalker was qualified. Based on Dr. Mody's report, as well as the updated Employability Assessment and Labor Market Analysis, MetLife denied Chalker's appeal on October 5, 2004.

In denying Chalker's appeal, MetLife was dismissive of Dr. Jepson's SFC because Dr. Jepson "did not provide office notes or physical exam findings. In addition, Dr. Jepson did not comment on [Dr. Schmidt's report]...." Additionally, in order to support its decision, MetLife cited Dr. Mody's report, noting that Dr. Mody had spoken with Dr. McBride, and concluded that "there [was] no clear medical evidence in terms of [Chalker's] physical health to support recommending against all work." Lastly, MetLife cited a September 2004 report from a psychiatrist, Dr. Reginald Givens, that concluded "there is not clear medical evidence to support a psychiatric condition that would prevent [Chalker] from all work."

On October 21, 2005, over a year after MetLife denied Chalker's appeal, Chalker sued Defendants, asserting that he was improperly denied LTD benefits under the Plan. Defendants filed a motion for judgment on the administrative record. The district court granted this motion, concluding that Chalker's claim

was time-barred because he did not file his civil action within the one year contractual limitations provision contained in the Plan. Alternatively, the district court asserted that even if Chalker's claim were not time-barred, Chalker had not shown that MetLife's decision to deny him LTD benefits was arbitrary and capricious. Chalker now appeals.

## II. DISCUSSION

Because we believe this case can be readily decided on the merits, we need not consider whether Chalker's civil action is barred by the Plan's contractual limitations provision, and we instead focus our analysis exclusively on whether MetLife's decision to terminate Chalker's benefits was arbitrary and capricious.

## A. Standard of Review

The Plan grants MetLife discretionary authority to determine eligibility for LTD benefits.[1] Therefore, we agree with the district court that MetLife's decision should be reviewed under the arbitrary and capricious standard. See Gaither v. Aetna Life Ins. Co., 388 F.3d 759, 767 (10th Cir 2004). And "[b]ecause [Chalker] has not raised the issue of a potential conflict of interest warranting an enhanced standard of review, we assume that the pure arbitrary and capricious standard applies." Buckardt v. Albertson's, Inc., 221 Fed. App'x 730, 734 (10th

---

[1] In this regard, the Plan provides that "[t]he decisions of the Claims Administrator shall be conclusive and binding on all persons, unless a court of competent jurisdiction determines that such decision was arbitrary and capricious."

Cir. 2007) (unpublished) (citing Fought v. UNUM Life Ins. Co. of Am., 379 F.3d 997, 1003 (10th Cir.2004)).

"The district court's determination of whether a plan administrator's decision is arbitrary and capricious is a legal conclusion subject to de novo review." Rekstad v. U.S. Bancorp, 451 F.3d 1114, 1119 (10th Cir. 2006). "Indicia of arbitrary and capricious decisions include lack of substantial evidence, mistake of law, bad faith, and conflict of interest by the fiduciary." Caldwell v. Life Ins. Co. of N. Am., 287 F.3d 1276, 1282 (10th Cir. 2002). "Substantial evidence is such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the decisionmaker." Id. (alteration, quotations omitted). "Substantial evidences requires more than a scintilla but less than a preponderance." Sandoval v. Aetna Life & Cas. Ins. Co., 967 F.2d 377, 382 (10th Cir. 1992) (quotation omitted).

"When reviewing [MetLife's decision] under the arbitrary and capricious standard, [MetLife's] decision need not be the only logical one nor even the best one. It need only be sufficiently supported by facts within [its] knowledge to counter a claim that it was arbitrary or capricious." Kimber v. Thiokol Corp., 196 F.3d 1092, 1098 (10th Cir. 1999) (alterations, quotations omitted). With this in mind, "[t]he decision will be upheld unless it is not grounded on any reasonable basis." Id. (quotation omitted).

## B. Chalker's Arguments

Chalker briefly advances several arguments in an effort to prove that MetLife's decision was arbitary and capricious. We consider each in turn.

### 1. MetLife did not consider information provided by Chalker's treating physicians

Chalker's argument that MetLife failed to consider information provided by his treating physicians is unavailing. There is no evidence in the record suggesting that MetLife ignored the reports of Drs. McBride and Jepson; indeed, the evidence is to the contrary. MetLife consistently provided the reports of Drs. McBride and Jepson to the IPCs who independently evaluated Chalker's condition. Although Chalker may disagree with the analysis of the IPCs, there is simply no evidence that MetLife failed to consider the materials provided by his treating physicians.

As the Supreme Court indicated in Black & Decker Disability Plan v. Nord, 538 U.S. 822, 834 (2003):

> Plan administrators, of course, may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician. But, we hold, courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation.

Thus, it was not arbitrary and capricious for MetLife to credit the reports of the two IPCs rather than the reports of Drs. McBride and Jepson; MetLife did not

owe the opinions of Drs. McBride and Jepson any special deference. <u>Meraou v. Williams Co. Long Term Disability Plan</u>, 221 Fed. App'x 696, 702 (10th Cir. 2007) (unpublished opinion) (asserting that "[i]n ERISA cases no special deference is due the opinion of the claimant's treating physician.").

## 2. MetLife relied upon a flawed and inconsistent FCE

Chalker also asserts that numerous flaws with the FCE rob it of any utility in assessing whether he ought to receive LTD benefits. In <u>Buckardt</u>, 221 Fed. App'x at 736, this court considered the utility of FCEs that "contain[ed] some contradictory findings...." At issue there were FCEs that asserted the claimant

> had to change postures frequently during the evaluation, experienced high pain levels at certain times during the testing, reported difficulty sitting, standing, walking, and lifting, and reported pain that prevented her from hobbies, sports, sexual relations, chores, and work. However, despite noting these difficulties, both [FCEs] ultimately concluded that [the claimant] was capable of modified sedentary work.

<u>Id.</u> Despite these contradictory findings, this court nevertheless asserted that the administrator could rely on the FCEs, as under the arbitrary and capricious standard of review, "'[t]he Administrator['s] decision need not be the only logical one nor even the best one. It need only be sufficiently supported by facts within [his] knowledge to counter a claim that it was arbitrary and capricious.'" <u>Id.</u> (quoting <u>Kimber</u>, 196 F.3d at 1098.)

The same notion rings true in this case. Although there may well be some flaws with the FCE, it is not so flawed that it could not have provided MetLife

with any reasonable basis to terminate Chalker's LTD benefits. That is, the evidence is of the sort that "a reasonable mind could accept as sufficient." Adamson v. UNUM Life Ins. Co. of Am., 455 F.3d 1209, 1212 (10th Cir. 2006).

### 3. MetLife relied upon the opinions of IPCs whose qualifications with respect to fibromyalgia were not established

Next, Chalker contends that the qualifications of Drs. Schmidt and Mody with respect to fibromyalgia were not established. Drs. Schmidt and Mody, however, are both Board Certified in Rheumatology; "rheumatology is the relevant specialty for fibromyalgia." Howell v. Astrue, 248 Fed. App'x 797, 798 (9th Cir. Sept. 19, 2007) (unpublished). Nevertheless, Chalker contends that "[a]lthough fibromyalgia may generally be included within the field of rheumatology, that does not mean all rheumatologists are qualified to handle fibromyalgia cases."

While it is no doubt true that some rheumatologists have more expertise in fibromyalgia than others, it cannot be said that MetLife's reliance on the opinions of two independent, board certified rheumatologists was arbitrary and capricious. Although MetLife may have been better served by finding rheumatologists with fibromyalgia specialties, it cannot be concluded that doing so was required under the arbitrary and capricious standard of review. Again, the opinions of Drs. Mody and Schmidt, provided evidence of the sort that "a reasonable mind could accept as sufficient." Adamson, 455 F.3d at 1212.

**4. Defendants relied upon the opinions of IPCs who disagreed**

Next, Chalker points out that Drs. Mody and Schmidt disagreed regarding the level of work he was capable of performing. In this respect, Dr. Mody concluded that Chalker was capable of sedentary work, while Dr. Schmidt concluded that Chalker was capable of light level work. This disagreement, however, is of no aid to Chalker's claim. While Drs. Mody and Schmidt may have disagreed about the level of work Chalker was capable of, they did not disagree that Chalker was capable of performing <u>some</u> level of work. And whether that work be at a sedentary or light level is immaterial in deciding whether MetLife arbitrarily and capriciously denied Chalker LTD benefits.

**5. Defendants failed to consider Chalker's medication/pain/or other circumstantial evidence in determining whether he was disabled**

Finally, Chalker asserts, without elaborating, that MetLife ignored Chalker's medication schedule, constant pain, and "other circumstantial evidence" in concluding that he was no longer qualified for LTD benefits. Because Chalker does not extrapolate on these arguments, it is difficult to determine his precise claims. In any case, the arguments are of no aid to Chalker in surmounting the arbitrary and capricious standard of review.

Again, the question for this court is not whether MetLife made the "correct" decision in terminating Chalker's LTD benefits. Instead, the question is whether MetLife had a reasonable basis for the decision that it made. We are

confident that it did. In determining that Chalker was not qualified for LTD benefits, MetLife relied on the evaluations of two independent, board certified rheumatologists as well as the independent FCE, all of which suggested that Chalker could perform some level of work. While Chalker may be able to dispute this evidence, he cannot contradict it to such an extent that it can be said MetLife's decision was arbitrary and capricious.

### III. CONCLUSION

Based on the foregoing, the judgment of the district court is AFFIRMED.


ENTERED FOR THE COURT


David M. Ebel
Circuit Judge

07-4069, Chalker v. Raytheon Company, et al.

**BRISCOE, J.** dissenting:

I respectfully dissent. In my view, the administrative record firmly establishes that MetLife's decision to terminate Chalker's disability benefits was arbitrary and capricious because it was based, in substantial part, on a critically flawed Functional Capacity Evaluation (FCE) summary report. Further, it is apparent from the record on appeal that the district court erred in concluding that Chalker's suit was time-barred. I would reverse and remand for further proceedings.

I.

*Defendants' termination of Chalker's disability benefits*

Although I agree with the majority's resolution of most of the challenges leveled by Chalker against MetLife's decision, I disagree with the majority's conclusion, in Section II.B.2, that the FCE summary report was "not so flawed that it could not have provided MetLife with any reasonable basis to terminate Chalker's [long-term disability] benefits." O&J at 12-13. On this key point, I conclude, after carefully examining the administrative record, that reasonable minds simply could not accept as sufficient the conclusions reached in the FCE summary report. Adamson v. Unum Life Ins. Co. of Am., 455 F.3d 1209, 1212 (10th Cir. 2006).

To begin with, the detailed findings reported in the FCE summary report are inconsistent with, and ultimately fail to support, the conclusion reached in the FCE summary report. In particular, the FCE summary report acknowledged that Chalker, due to what it described as "intolerable pain" (or, alternatively, as "8" or "8-9" on a "0-10 subjective pain scale"), was unable to complete 19 of the 21 tasks that were part of the FCE, and also "performed poorly on the sustained sitting task due to high pain scores and a high frequency of postural adjustments . . . ." Aplee. Supp. App. at 476. In addition, the FCE summary report acknowledged that Chalker's "tolerances for Light level work for the 8 hour day [we]re difficult to predict given the extent of [his] self-limiting behavior . . . ." Id. at 475. Nevertheless, the FCE summary report effectively criticized Chalker for failing to "demonstrate sufficient signs of maximal physical effort on the majority of the tasks," id., and ultimately concluded he was "capable of performing physical work at the Light level, as defined by the U.S. Department of Labor in the Dictionary of Occupational Titles." Id.

Moreover, the FCE summary report makes no mention of the fact that Chalker, according to his own undisputed reports and those of his treating physician, was on pain medication during the FCE and was incapacitated by pain for several days following the FCE. That evidence, as Chalker asserts, likewise calls into question the FCE summary report's conclusion that he was capable of performing "Light level" work on a full-time (8 hours per day, 40 hours per week)

- 2 -

basis.[1]  See Force v. Ameritech Corp., Inc., 250 Fed. Appx. 662, 669 (6th Cir.

2007) (concluding that administrator's decision to deny benefits was arbitrary and

capricious because, in pertinent part, it was based on an internally inconsistent

FCE).

Although MetLife's decision to terminate Chalker's long-term disability

benefits was not based solely on the FCE summary report, the administrative

record firmly establishes that it played a significant role in MetLife's decision.

To begin with, it is clear that it was the FCE summary report's conclusion that

Chalker could perform full-time work at a "Light level" that led to MetLife's

preparation of the Employability Assessment and Labor Market Analysis and, in

turn, that report's conclusion that Chalker was capable of working full-time in

several alternative management-type roles.  Further, it is clear from the

administrative record that MetLife's consulting physicians placed significant

weight on the FCE summary report and the related Employability Assessment.

For example, Dr. Schmidt, in her April 2004 final report, opined (without having

_____

[1] In Buckardt v. Albertson's, Inc., 221 Fed. Appx. 730, 736-37 (10th Cir. 2007), this court noted the existence of "contradictory findings" in two FCEs performed on the plaintiff in that case, but nevertheless concluded that the administrator's decision to deny benefits was neither arbitrary or capricious. Buckardt is distinguishable, however, because (a) the internal inconsistencies cited by the plaintiff in that case were nowhere near as serious as those at issue here, (b) there is no indication that the FCEs in Buckardt failed to account for critical information regarding the plaintiff, as is the case here, and (c) two FCEs were performed in Buckardt, and the two physical therapists who performed them independently concluded that the plaintiff was capable of performing modified sedentary work.

- 3 -

personally examined Chalker) that the conclusion set forth in the FCE summary report "represent[ed] a minimum, not a maximum, work capacity," and that "there was no objective evidence that [Chalker] would be unable to work in a light capacity on a full-time basis." Aplee. Supp. App. at 707. Similarly, Dr. Mody noted in her written report (likewise without having personally examined Chalker) that, according to the FCE summary report, "Chalker was found to be capable of sedentary level activities." Id. at 573. In turn, MetLife's own June 3, 2004 letter of denial noted that, according to the Employability Assessment, Chalker "ha[d] the ability to work at a light level" and had identified "[t]hree potential occupations for which [he was] qualified . . . ." Id. at 520. Likewise, MetLife's final denial letter of October 5, 2004, noted that Chalker's benefits "were [originally] terminated based" in part on the results of the FCE and the Employability Assessment, id. at 611, effectively criticized Chalker for engaging in "self-limiting" behavior during the FCE, id. at 612, and noted that, according to the Employability Assessment, he was capable of performing other alternative occupations, id.

In summary, MetLife's decision to terminate Chalker's long-term disability benefits was arbitrary and capricious due to the significant reliance that MetLife and its consulting physicians placed on the flawed FCE summary report. Accordingly, assuming that Chalker's suit was timely filed, the proper route is to

- 4 -

reverse the judgment of the district court and remand to MetLife for further consideration of Chalker's claim for long-term disability benefits.

*Timeliness of Chalker's lawsuit*

As the majority notes, the district court concluded, as an alternative basis for granting judgment in favor of defendants, that Chalker's suit was untimely filed. The district court's ruling on this issue is subject to de novo review. Wright v. Southwestern Bell Tel. Co., 925 F.2d 1288, 1290 (10th Cir. 1991) ("We review a district court's ruling on the applicability of a[n] [ERISA] statute of limitations de novo.").

ERISA contains no statute of limitations which governs claims under section 1132(a)(1)(B) or section 1132(c). Courts therefore look to the "most analogous" state statute of limitations, e.g., Held v. Manufacturers Hanover Leasing Corp., 912 F.2d 1197, 1201 and n.4 (10th Cir. 1990), or if the plan itself contains a limitations period, to the plan if the contractual limitations period is reasonable. E.g., Northlake Reg'l Med. Ctr. v. Waffle House Sys. Employee Benefit Plan, 160 F.3d 1301, 1303 (11th Cir. 1998); Doe v. Blue Cross & Blue Shield United of Wis., 112 F.3d 869, 874-75 (7th Cir. 1997).

Here, it is undisputed that Section 10.10 of the Plan purports to set forth a contractual limitations period:

> Limitation of Action. In addition to the provisions of Section 10.9 [requiring exhaustion of plan remedies], no action at law or in equity shall be brought to recover Benefits under the Plan prior to the

- 5 -

expiration of sixty (60) days after a claim has been filed in accordance with the requirements of the Plan, nor shall an action be brought at all unless within one (1) year after expiration of the time permitted under the Plan for furnishing proof of disability to the Claims Administrator.

Aplee. Supp. App. at 70.  Defendants argued in their motion for judgment on the administrative record, and the district court agreed, that this one-year limitations period was controlling, "accrued on the date that MetLife rendered its final decision on Chalker's administrative appeal of the termination of his benefits," and expired one year later, on or about October 5, 2005, approximately two weeks before Chalker filed this action (October 21, 2005).  App. at 35 (defendants' motion for judgment on the administrative record).

### a) Ambiguity of contractual limitations provision

Chalker contends that "Defendants' contractual limitations provision is unenforceable because it is not presented in a clear manner."  Aplt. Br. at 23.  In this regard, Chalker notes that the "contractual limitations provision . . . does not appear within the section of the Plan dealing with claim review or appeal procedures," but instead "appears within the 'General Provisions' section of the Plan, buried amidst legal boilerplate relating to choice of law and severability."  Id. at 20.  He also asserts that "the specific language of Defendants' contractual limitations provision is at best confusing, and at worst unintelligible."  Id.  In

particular, Chalker contends that the phrase "expiration of the time permitted . . .

for furnishing proof of disability," as used in the provision, is unclear.

Addressing Chalker's contentions in order, the positioning of the

contractual limitations provision within the Plan itself does not appear to be

problematic. To be sure, the contractual limitations provision is contained in

Article X of the Plan, which outlines the Plan's "General Provisions," rather than

Article VIII, which addresses the Plan's "Claims Procedure." That fact standing

alone, however, does not appear to render the contractual limitations provision

unenforceable.

Chalker's contentions regarding the lack of clarity of the contractual

limitations provision, on the other hand, have merit. As noted by Chalker, the

provision states that the one-year limitations period begins running "after

expiration of the time permitted under the Plan for furnishing proof of disability

to the Claims Administrator," Aplee. Supp. App. at 70, yet nowhere does the Plan

expressly set forth any time period for "furnishing proof of disability to the

Claims Administrator." In the district court's view, "[t]he 'expiration of the time

permitted . . . for furnishing proof of disability' clearly contemplate[d] the denial

of benefits after exhaustion of administrative remedies," and "[t]here c[ould] be

no other reasonable interpretation for this particular provision within the Plan."

App. at 103. The district court's analysis on this point is suspect, however,

because the phrase "furnishing proof of disability" clearly focuses on the act of

the claimant, i.e., submitting or furnishing documents or other evidence to the claims administrator, and thus contemplates a point in time prior to the claims administrator making a final determination on a claim for benefits or on the appeal of a denial of benefits. Thus, not only does defendants' purported construction of the contractual limitations provision fail to comport with its language, this critical portion of the contractual limitations provision is not "written in a manner clearly calculated to be understood by the average plan participant," as required by Section 1022(a) of ERISA, 29 U.S.C. § 1132(a). Accordingly, the consequences of defendants' inaccurate drafting should fall squarely on them, rather than on Chalker. See Chiles, 95 F.3d at 1518.

*b) SPD's silence as to contractual limitations period*

Chalker further contends "it is undisputed that Defendants' contractual limitations provision does not appear within the SPD." Aplt. Br. at 18. Thus, he contends, "such provision is in violation of 29 U.S.C. Section 1022(a), and is unenforceable against [him]." Id. Chalker also asserts, and correctly so, that the district court failed to address this argument.

"Where the SPD [at issue] is silent on a provision that the plan documents include, and plaintiff contends therefore the term cannot apply to him," "a two-step approach" must be used "to analyze plaintiff's argument." Tocker v. Philip Morris Co., 470 F.3d 481, 488 (2d Cir. 2006). "First, relying on the statutory language of ERISA and its implementing regulations," the court must "look to see

whether ERISA requires the term to be stated in the SPD."  Id.  "Second," the court must "consider whether plaintiff was likely prejudiced by the SPD's silence on the term or information at issue."  Id.; see Chiles, 95 F.3d at 1519 (holding that, where an SPD incorrectly describes Plan benefits, the claimant must demonstrate, in order to secure relief, that he significantly relied upon, or was possibly prejudiced by, the faulty plan description).

ERISA's statutory language provides, in pertinent part, that "[t]he summary plan description shall contain" information regarding "the remedies available under the plan for the redress of claims which are denied in whole or in part . . . ."  29 U.S.C. § 1022(b).  Although this statutory language does not speak directly to the filing of a lawsuit under ERISA or the limitations period that applies to the filing of such a lawsuit, ERISA's implementing regulations do.  Specifically, 29 C.F.R. § 2520.102-3 outlines in substantial detail the contents that must be included in the summary plan description.  Among those requisite contents are:

> The procedures governing claims for benefits . . . , applicable time limits, and remedies available under the plan for redress of claims which are denied in whole or in part . . . .

29 C.F.R. § 2520.102-3(s) (emphasis added).  In my view, this regulatory reference to "applicable time limits," particularly since it is mentioned in the same sentence as "procedures" and "remedies," includes the applicable time limits, after administrative appeals have been exhausted, for filing suit to challenge a denial of benefits (especially if the time period for doing so is

- 9 -

controlled by the plan at issue and is shorter than the otherwise applicable statute of limitations).

Reviewing the SPD at issue here, it is clear that it failed to satisfy these regulatory requirements. To be sure, the SPD outlined in detail the administrative appeal procedures available to a claimant whose claim had been denied, including the time limits applicable to those procedures. Aplee. Supp. App. at 25. The SPD also contained a lengthy section entitled "YOUR RIGHTS UNDER ERISA," which indicated, in pertinent part, "If you have a claim for benefits that is denied or ignored in whole or in part, you may file suit in a state or federal court." Id. at 27. This same section also indicated, in pertinent part, that "[i]f you [the claimant] have any questions about . . . your rights under ERISA, you should contact the nearest office of the Pension and Welfare Benefits Administration, U.S. Department of Labor, listed in your telephone directory, or the Division of Technical Assistance and Inquiries [in] . . . Washington, DC . . . ." Id. Notably, the SPD made no mention of the generally applicable time limits for filing suit under ERISA, or of the specific time limitation for doing so that was set forth in the Plan itself. Thus, a plan participant reviewing and relying on the SPD would not have been aware of the Plan's purported one-year time period for filing suit, and, had they contacted either of the federal offices listed in the SPD to inquire about the time for filing suit, would likely have been told only of the rule generally applicable to ERISA law suits. In other words, the federal offices listed

in the SPD would not have known about the unique, one-year limitations period set forth in the Plan.

That leads to the second question in the two-part inquiry, i.e., was Chalker "likely prejudiced" by the SPD's silence on this matter? In other words, given the circumstances at issue here, is it "probable" that Chalker would have filed his action within the one-year contractual limitations period had "the SPD been adequate"? Wilkins v. Mason Tenders Dist. Council Pension Fund, 445 F.3d 572, 585 (2d Cir. 2006). The administrative record compiled by defendants contains nothing relevant to this inquiry (e.g., a letter from MetLife to Chalker advising him of the one-year contractual limitations period). Nor does Chalker's response to defendants' motion for judgment (e.g., an affidavit from Chalker), although that is understandable in light of the fact that defendants' motion was expressly based solely on the administrative record. Given the absence of any significant evidence on the "likely prejudice" issue, the best course in my view it to remand

this case to the district court for further proceedings on the issue.[2]  See Chiles, 95 F.3d at 1519 ("we leave it to the district court to determine the issue of reliance").

## II.

For the reasons outlined above, I would reverse the judgment of the district court and remand for further proceedings on the issue of whether Chalker was "likely prejudiced" by the failure of the Summary Plan Description to inform him of the one-year contractual limitations provision.  If, on remand, the district court determines that Chalker was "likely prejudiced," then the district court should

_____

[2] In the absence of a remand, it appears more likely than not that Chalker was prejudiced by the SPD's silence as to the existence of a contractual limitations period. "[T]he SPD is an employee's primary source of information regarding employment benefits, and employees are entitled to rely on the descriptions contained in the summary." Mario v. P&C Food Mkts., Inc., 313 F.3d 758, 765 (2d Cir. 2002) (internal quotation marks omitted); see Chiles, 95 F.3d at 1519 ("the purpose of the SPD is to give employees an understanding of the plan upon which they are entitled to rely"). An employee in Chalker's situation who relied exclusively on the SPD at issue in this case, including calling one or both of the federal offices listed in the SPD, would not have been aware of the one-year limitations period set forth in the Plan, and instead presumably would have relied on the general principles of law applicable to ERISA claims. Under those principles, an action seeking benefits under ERISA must comply with the "most analogous" state statute of limitations. Held v. Manufacturers Hanover Leasing Corp., 912 F.2d 1197 (10th Cir. 1990). In this case, which was brought in Utah, the most analogous state statute of limitations is Utah's three-year statute of limitations applicable to written policies or contracts of first party insurance, Utah Code Ann. § 31A-21-313(1). Lang v. Aetna Life Ins. Co., 196 F.3d 1102, 1104 (10th Cir. 1999) (holding that this statute was the most analogous state statute for purposes of ERISA action filed in Utah). Thus, absent the one-year limitations period set forth in the Plan, Chalker would have had three years in which to file suit challenging the denial of his administrative appeal, and his action indisputably would have been timely.

- 12 -

remand the case to MetLife for further consideration of Chalker's claim for long-term disability benefits.